THE STATE OF OHIO, APPELLEE, *v.* REID, APPELLANT. (Two cases.)

[Cite as State v. Reid, 3 Ohio App. 2d 215.]

(Nos. 1274 and 1286—Decided August 18, 1965.)

*Mr. Robert L. Balyeat*, prosecuting attorney, for appellee.
*Mr. Anthony J. Bowers* and *Mr. Richard V. Nahabedian*, for appellant.

GUERNSEY, J. For convenience the two appeals with which we are here concerned were heard together. The appeal in

case number 1274 is from a judgment convicting the defendant, Reid, of the crime of first degree manslaughter and sentencing him therefor, and the appeal in case number 1286 is from an order of the Common Pleas Court overruling the defendant's motion for new trial made on the ground of newly discovered evidence.

In case number 1274 we have considered Reid's first six assignments of error relating to the admission and exclusion of evidence and to the overruling of his motions for dismissal and for reduction of the charge, made at the close of the state's evidence, and find no error in any of the respects therein contended prejudicial to the defendant. Reid's other assignments of error, which we will consider together, are as follows:

"7. The court erred in its charge to the jury

"8. That the verdict is contrary to law.

"9. That the verdict is against the weight of the evidence.

"10. That court erred in denying defendant's request for a new trial.

"11. The jury erred in not following instructions of the court in applying evidence to defense of self-defense."

The evidence shows without dispute that on August 5, 1963, one Robert Bensman was shot by the defendant, Reid, and there is evidence of probative value which, *if standing alone*, tends to prove the crime for which Reid was found guilty. However, Reid contends the homicide was justified and excusable under the law, as having been committed by him in self-defense, and that a preponderance of the evidence, the measure of proof required for this defense, shows such to be the case.

It is undisputed that Bensman was a powerful man, and his wife testified that he was six feet tall, his normal weight was 255 pounds, and at the time of his death he was 31 years of age. Reid was slightly taller, weighed less than Bensman, and was 43 years of age at the time of trial. Although we do not find same in the record, it is stated in Reid's brief that he is approximately six foot, three inches tall and weighs 190 pounds; and his actual height and weight were observable to the jury. It is further undisputed that on July 3, 1963, approximately one month before the homicide, Reid was accidently shot in his left elbow by his wife with her .22 caliber re-

volver, which had belonged to her former husband and which is the same weapon with which Reid thereafter shot Bensman. Reid's physician testified as to the shattering of the end of the bone "so that the muscle that ordinarily pulls your arm out, was completely torn loose;" that the injury required him to "reattach the tendon to the bone a little further down," to put the arm in a heavy cast initially, and then to provide Reid with a removable aluminum lightweight cast so that he could move around. Though Reid was not wearing any cast at the time of the events leading to the killing, the evidence is undisputed that had he followed his doctor's orders he should have been wearing it, that his arm had not healed at that time, that he was not able to nor did he use it in protecting himself, and that this condition was generally known by the men who worked under his supervision.

The events leading to the killing might be considered as being divided roughly into three skirmishes between Reid and Bensman.

The first skirmish took place behind the house trailer in which Reid made his home. Reid claims that Bensman was the aggressor, but Kennedy and Blake, two of the state's three eyewitnesses to this skirmish, who were co-workers with Bensman on bridge building projects supervised by Reid for their employer, testified that the first skirmish was brought about by Reid. Their testimony was further to the effect that though Reid was the first one to swing they never saw him land an effective blow, that Bensman hit Reid knocking him against the back of the trailer causing him to hit his head thereon, forced Reid to the ground, sat upon him and throttled him until Reid started turning blue, and released Reid only when Blake told Bensman to, because Blake thought that "if he hadn't of got off of him, he could have killed him," and that Kennedy and Blake did not otherwise interfere either because it was not their fight or because of Bensman's great strength which was well known to them. Hamilton, another co-worker and the third eyewitness for the state, supported this testimony in part.

Kennedy and Blake testified to the effect that the second skirmish started momentarily after the first, that Reid again was the aggressor, that again they did not see him land any tell-

ing blows, and that Bensman forced defendant to the ground at least once and landed a hard blow to Reid's forehead causing him to bleed profusely from a laceration made over his right eye. Hamilton also supported some of this testimony.

Kennedy testified that when the second skirmish stopped Reid "ran for the trailer," "to get away," with Bensman behind him "running in the same direction." Hamilton testified that "he [Bensman] knocked Al [the defendant] down and they went over towards the back, and I heard Bob [Bensman] saying about, 'Did you have enough,' or something, and he got up off him and he started towards his car and Al went this way. Al got up and started going in the opposite way." Blake testified that after Bensman hit Reid with one blow and knocked him down, "that is when Al got up, bleeding from his forehead, and that is when he took off toward the trailer," and "Bensman took after him," that "you could tell he [the defendant] was still weak" and "he was still staggering," that Bensman was approximately four feet behind him, and he figured they were still going to fight "if Bensman could have caught him."

The third and final skirmish was seen in part or in its entirety by these same three witnesses, and by another witness for the state, named Ruble, who was a foreman on the bridge projects, over the other workers and under Reid. Their testimony varies in some slight degree, primarily by reason of the difference in the positions from which they observed Bensman and Reid. In summary, however, and ignoring slight or immaterial inconsistencies, it appears from their testimony and from photographs that Reid ran around the tongue end of the trailer, followed closely by Bensman; that the entrance door to the trailer was about six to seven feet from the tongue end; that there was a set of three steps leading to the ground from the entrance door with a railing on the right side of the steps; that the steps extended forward from the wall of the trailer a distance of several feet; that Reid entered the trailer and closed the door; that Ruble's station wagon was parked opposite, approximately parallel to, and five to six feet from the closed door of the trailer, with the front end of the station wagon headed in the same direction as the tongue end of the trailer; that Bensman ceased his pursuit at some place short of the trailer door and went to his own car, which was parked near the tongue

end of the trailer with the driver's door facing the trailer; that Bensman opened this door as if to get in, turned about without getting in, shut the door, and then proceeded in the general direction of the foot of the steps in the space between Ruble's station wagon and the front door of the trailer (although some of the testimony as to this direction was not very specific in the record, the jury could have inferred both from the testimony and from the bullet path of the wounds in Bensman's body that this direction was not parallel to the door wall of the trailer but was on an angle thereto and on a line leading from the driver's door of Bensman's car toward the driver's door of Ruble's car); and that as Bensman reached a point short of but near the foot of the steps Reid, standing partly in and partly out of the trailer doorway, fired four shots toward Bensman.

A pathologist testified that three of these shots passed through Bensman at a downward angle, one through his right arm from the outside to the inside, one through his left leg from the inside to the outside, and a third shot, which apparently contributed most greatly to his death several days thereafter, passing downward through his organs from a point on a line descending vertically from the posterior point of his right armpit and at the level of his 10th rib to a point near the iliac crest, the left frontal portion of his hipbone.

Reid took issue with many of the things testified to by the eyewitnesses but, with particular pertinence to the matters with which we are here concerned, testified to the effect that Bensman was the aggressor at all times; that as he (Reid) ran toward the trailer he was dazed from the beating that he had taken; that he closed the trailer door behind him; that as he stood inside the trailer, he was bleeding from his nose and right eye but "felt that it [the fight] was over with" and "I would have never went back out"; that while wiping the blood out of his eyes he "heard the door click" and someone on the outside (he thought Kennedy) hollering, "Kill that son of a bitch. Go in and kill that son of a bitch;" that he did not at any time look out the window or through the glass door pane; that when he heard the door click, "I raised up like this and when I raised up, this gun was laying on top of the refrigerator and I saw the gun and I grabbed the gun like this (indicating)

and I turned for the door and hollered, 'Get back. Get back.' and he [Bensman] snatched the door open and I fired through the door[way] three times"; that "the door flew open and I turned around," and the next thing I saw was a hand [Bensman's] coming like that (indicating)"; that "he had something [in his hand]. I don't know what it was," and "I saw his hand as it was coming in and I started firing"; that "He [Bensman] was on the steps. He was coming in"; and that at the time he "was scared of Bensman," and thought that "he would have killed me if he would have got in there."

There was no testimony by any of the state's four eyewitnesses to the third skirmish that Bensman was armed or carried any weapon, other than his fists and hands, at the time that the shots were fired. *State v. Powell,* 75 Ohio Law Abs. 33, motion for leave to appeal overruled March 7, 1956; and *State v. Schaffer,* 113 Ohio App. 125. Kennedy denied that he yelled anything when Reid was in the trailer except to Bensman, "Bob, you had better get out of here." None of them saw Reid open the trailer door immediately before the shooting, and those who were watching Bensman's movements indicated that he had not reached the door, so would not, therefore, have opened it.

While one who first makes a malicious assault upon another continues in the conflict which ensues, he can not justify taking the life of his adversary, however necessary it may be to save his own, or to whatever extremity he may be reduced. But when he has succeeded in wholly withdrawing from the conflict, and, in good faith, has retreated to a place of apparent security, his right of self-defense is fully restored, and, if pursued by his antagonist and there attacked in a manner to endanger his life, he is justified in taking life if, in the careful and proper use of his faculties, he believes in good faith, and has reasonable ground to believe, that he is in imminent danger of death or great bodily harm, and that his only means of escape from such danger will be by taking the life of his assailant, although in fact he is mistaken as to the existence or imminence of the danger. *Stoffer v. State* (1864), 15 Ohio St. 47, and *Marts v. State* (1875), 26 Ohio St. 162. See also *State v. Champion* (1924), 109 Ohio St. 281. The burden of proving that the shooting was excusable upon such ground rests upon the defendant and must be established by a preponderance of the

evidence. *Szalkai* v. *State* (1917), 96 Ohio St. 36, and authorities therein cited.

Another aspect of the defense of self-defense is the place where the attack occurs. In Ohio it is the law that where one is assaulted in his home, or the home itself is attacked, he may use such means are are necessary to repel the assailant from the house, or to prevent his forcible entry, or material injury to his home, even to the taking of life. But a homicide in such a case would not be justifiable unless the slayer, in the careful and proper use of his faculties, in good faith believes, and has reasonable ground to believe, that the killing is necessary to repel the assailant or prevent his forcible entry. *State* v. *Peacock* (1883), 40 Ohio St. 333. It has also been held in South Dakota that after a man goes into his own house he is not required to close the door and remain inside, even though if he does so he may not be further molested; and when a man is unlawfully assaulted on his own premises he may arm himself and, standing upon his own doorstep, defend himself to the last extremity against all assailants. *State* v. *Bell* (Supreme Court of South Dakota, 1916), 38 S. D. 159, 160 N. W. 727.

It is the duty of this court in reviewing a case upon the weight of the evidence to determine whether the verdict is supported by the degree of proof which the character of the case requires, and to render its judgment according to such determination. In reviewing a criminal case upon the weight of the evidence this court owes a greater duty than to determine merely whether there was "some evidence" tending to support the verdict. In such situation if we are unable to determine from the record wherein the truth lies between conflicting evidence, we may well adopt the conclusion of the jury and the trial court, they being in a better situation to judge of the truth by reason of their opportunity to see the witnesses and observe their conduct. But where the truth is manifest upon the record itself, by reason of the absence of conflict, or by any other sound reason, we cannot escape our duty to determine whether the verdict and/or judgment is supported by the degree of proof which the character of the case requires. *Cooper* v. *State* (1930), 121 Ohio St. 562.

Though the record consists of more than 1,200 pages of testimony, which we have reviewed in its entirety, the jury

might have properly concluded from the testimony of the state's eyewitnesses alone that even if Reid were the original aggressor he had withdrawn from the conflict and retreated to a place of apparent security, and that the fact of such withdrawal and retreat was known to Bensman. The jury might also have properly concluded that at that time and place Reid was, in effect, a one-armed man who had been badly beaten by the fists and hands of Bensman, a powerful man at least ten years younger and fifty pounds heavier, and that Reid knew from this experience that his own fists and hands were not sufficient to defend him should Bensman renew his onslaught against him.

From Reid's own testimony, however, the jury was required to conclude, and we must conclude, that when Reid reached the refuge of his trailer he "felt that it was over with" and that he "would have never went back out." At that point of time his state of mind was such that he could not satisfy one of the elements essential to self-defense, either of self or of home, i. e., that he in good faith believed that he was in imminent danger. See, for example, *State* v. *Champion*, 109 Ohio St. 281.

Did anything happen to change this state of mind prior to the shooting? Reid says that he heard someone, he believed Kennedy, shout, "Go in and kill that son of a bitch," and that immediately he heard a click of the door and it was thrown open by Bensman, who was in the act of coming into the trailer. If Reid's testimony in this respect were undisputed, or if Reid had testified that he had looked out the window or through the door glass of the trailer and seen Bensman coming toward the trailer door, Reid might have established a justifiable killing. However, the state's eyewitnesses either deny any knowledge of such a shout, or do not testify as to same, and none of them testify that Bensman had touched the door or even that he had reached a point where he could have done so. In fact, they testify that the shooting started before Bensman had quite reached the foot of the steps to the trailer; and Reid testified repeatedly that at no time had he looked through the window or door glass of the trailer and that he did not see Bensman until Bensman threw open the door.

Thus this essential evidence reflecting on Reid's state of mind, the crux of the right to kill in self-defense, is so con-

flicting that we are unable to determine from the record wherein the truth lies and cannot, therefore, arrive at a conclusion on the evidence different than that of the jury and the trial court. *Cooper* v. *State*, 121 Ohio St. 562, 569. The verdict is not manifestly against the weight of the evidence.

Of greater concern in this review is one paragraph of the trial court's instruction to the jury as to the right of self-defense, specifically:

"If it is *or should be* apparent that an assailant is without a deadly weapon, *or* is not able or does not intend to kill or do great bodily harm, then the defendant, having notice of his adversary's position, is relieved of the danger, and the right to use force in self-defense is ended. If he continues the fight, he becomes the aggressor, and a subsequent injury to another is unlawful." (Emphasis added.)

This instruction is not qualified or diminished in its application by any other portion of the court's charge and must therefore be considered literally. We have searched without avail for some decision where an instruction in these words has been considered and approved. We have requested counsel to supply us with some authority, if any such exists, and they have not been able to do so.

The words which we have emphasized in the instruction are those which give us pause. Under the leading case in Ohio on self-defense, *Marts* v. *State*, 26 Ohio St. 162, "homicide is justifiable on the ground of self-defense, where the slayer, in the careful and proper use of his faculties, *bona fide believes*, and has reasonable ground to believe, that he is in imminent danger of death or great bodily harm, and that his only means of escape from such danger will be by taking the life of his assailant, although in *fact* he is mistaken as to the existence or imminence of the danger." The test relates therefor to the *actual* state of mind of the slayer and its *bona fides*, or good faith, and whether such state of mind is on reasonable grounds, not reasonable as to a reasonable man, but reasonable as to the slayer. The test does not relate to what *should be*, but may not be, apparent to the slayer.

An even more serious objection to the instruction is the use of the emphasized word "or," which in the sense it appears in the instruction is used in the disjunctive. This gives the

instruction a double barrelled effect, *i. e.,* (1) if it is apparent that an assailant is without a deadly weapon, or (2) if it is apparent that an assailant is not able or does not intend to kill or do great bodily harm, then, *in either case,* the defendant, having notice of his adversary's position, is relieved of the danger, and the right to use force in self-defense is ended. So given, the instruction would have permitted the jury to conclude that Bensman was without a deadly weapon which fact was apparent to Reid and, for that reason alone, Reid was deprived of his right to use force in self-defense. So understood, the jury may have arrived at the verdict which it did here without resolving the conflict in the testimony hereinbefore referred to relating to Reid's state of mind at the time of the shooting.

We are familiar with, and our attention has been invited by the prosecuting attorney to, the case of *Donald* v. *State* (1900), 21 C. C. 124, 11 C. D. 483, where the Circuit Court somewhat reluctantly found that the state rather than the defendant was prejudiced by, and that there was no error in, the following charge given by the trial court therein:

"If the jury find that the shot that killed Snyder was fired when the two men were lying in the gutter on the west side of Jackson street, and that during the conflict preceding their falling into the gutter, Snyder had become disabled or disarmed, or both, and the danger to which the defendant, Donald, had been subjected before they fell into the gutter had passed, regardless of how it may have been brought on, and the defendant in the proper use of his faculties, if at the time he had the proper use of his faculties, knew *or had reasonable grounds to know and should have known* that Snyder had, after the beginning and during the continuance of the conflict, become disabled or disarmed, or both, *and* was not in a condition to kill the defendant or do him great bodily harm by reason of being so disabled or disarmed, or both, then the defendant, Donald, would not be in a situation to invoke the law of self-defense and take the life of Snyder under such circumstances, if he did so take it." (Emphasis added.)

The only clause objected to in the *Donald case* was, "and should have known that Snyder had." It will be observed, however, that the clause objected to, unlike the one in the case before us, was in conjunction with the words "had reasonable grounds to know," which brought the instruction within the

scope of the *Marts case*, and that the word "and" is used conjunctively, in a place similar to that where "or" is used in the case before us, so that the assailant had to be both disabled or disarmed *and* not in a condition to kill or do great bodily harm before the jury could find the slayer deprived of the right of self-defense. Moreover, the court's finding that there was no error became *obiter dictum* for it sent the *Donald case* back for new trial on other grounds.

Whether we like it or not, criminal cases must be reviewed by this court in the light of Section 2945.83, Revised Code. *State v. Huffman*, 131 Ohio St. 27. Among other things, this section prescribes:

"No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of:

"* * *

"(D) A misdirection of the jury unless the accused was or *may have been prejudiced thereby*;

"* * *." (Emphasis added.)

Unlike subsection (E) of such section, which requires that prejudice must appear affirmatively on the record, subsection (D), relating to the charge to the jury, requires merely that the accused "may have been prejudiced" by the charge.

We are of the opinion that the charge as here given, for the reasons hereinbefore stated, may have prejudiced the defendant, and that the giving of same therefore constituted reversible error.

We therefore find, in case number 1274, that assignments of error 1, 2, 3, 4, 5, 6, 9, and 11 are not well taken, and that assignments of error 7, 8, and 10 are well taken. For these errors the judgment of the trial court is reversed and the cause is remanded thereto for new trial and for further proceedings as provided by law.

Such being our judgment in case number 1274, the issues on appeal in case number 1286 thereby become moot and the latter appeal is dismissed.

*Judgment reversed in case number 1274.*
*Appeal dismissed in case number 1286.*

YOUNGER, P. J., and MIDDLETON, J., concur.