STATE OF WEST VIRGINIA

*v.*

JACQUETTA GIALDELLA

(No. 13950)

Decided May 15, 1979.

*W. A. Thornhill, III, Thornhill, Kennedy & Vaughan, Leo Bridi* for plaintiff in error.

*Chauncey H. Browning,* Attorney General, *Joseph C. Cometti,* Assistant Attorney General, for defendant in error.

HARSHBARGER, JUSTICE:

Jacquetta Gialdella was indicted for murder in February of 1975 in the Circuit Court of Raleigh County. She was tried by jury and on March 26, 1976, found guilty of voluntary manslaughter. A motion for a new trial was overruled and defendant was sentenced to one to five years imprisonment. This Court granted her motion for a writ of error and supersedeas on June 13, 1977.

The homicide occurred at the defendant's home on October 5, 1974. She had gone to dinner that evening with Mr. E. L. Carter, a family friend, and returned home at approximately 11:00 p.m. Carter had walked defendant to the front door of her house, because as he testified, Charles Traybor, the deceased, had been annoying her and it was Carter's habit to look around the premises for Traybor whenever he took defendant home. Soon after Carter left Traybor rang the doorbell, then jerked the door open and entered the house. The defendant, a forty-one year old widow at the time of the trial, testified that the deceased threatened to rape and kill her; made other threatening remarks and attempted to choke her and bound her with a tie he found in the

house. At one point, he ordered her to get her coat and leave the house with him. She acquiesced because as she testified, her coat was in a bedroom and she thought she could escape by going into the bedroom. He followed her, preventing her escape. Later he untied her and handed her car keys he had taken from her earlier; she then threw the keys out of sight in the bedroom so that she would not have to accompany Traybor away from the house. The state police report corroborated this fact.

Defendant related that after Traybor then refused to leave, and continued shoving and striking her in the face, she attempted to protect herself by striking back, then ran to the bedroom and picked up a loaded shotgun which she kept there. Keeping the gun aimed at Traybor, she backed her way through the living room to the front door. She told him that she did not want to shoot him, and he said to go ahead and shoot, that he wanted her to. At some point here, the deceased picked up a pellet gun and pointing at her face, told defendant that "I don't want to curse, but god damn I'm going to blow both of your eyes out if you run any farther." Thereafter Traybor dropped the pellet gun and grabbed the barrel of the shotgun which discharged, fatally wounding him. Defendant testified that the gun fired when Traybor grabbed it.

Ballistics test performed by the state police corroborated the close proximity of defendant to Traybor when the shot was fired, and that a .410 gauge shotgun found at the scene had a spent shell in it. Although a ballistics expert said he found no smudges on the barrell of the gun, he explained: "[I]t's not always possible to tell that it's [shotgun barrel] been handled. That depends on a lot of things. We may have a problem with the surface, or they may have had something, like a glove on their hand, or a lot of facts that are unknown to me. It's possible someone could have handled it and still not be possible for us to develop a smudge or print."

The pellet gun was found leaning against the door casing according to one officer, but the defendant's

mother testified that she saw another trooper pick it up from the porch and place it there.

When the two state police troopers arrived to investigate the shooting, Traybor was found laying on the porch with an abdominal wound and defendant was inside the house. Also present were the defendant's neighbors, Mr. and Mrs. Boyden.

The same evening during the ensuing investigation but before any suspects had been identified, one state police trooper asked defendant who shot the victim and she replied "I did." Shortly thereafter, Trooper Estep and defendant went into the livingroom where Mrs. Gialdella refused to sign the waiver of rights form, gave a statement but refused to sign a written version prepared by the policeman. The trooper said he read the Miranda warnings to her from a standard form used by the Department of Public Safety, after which even though she refused to sign anything, she volunteered to tell him what happened.

Defendant testified that she did not remember being read her rights, nor being asked to sign a waiver form, and that the trooper told her she would be charged with murder if she refused to sign the statement. Pansy McBride, the defendant's mother, was present during a portion of the questioning and testified that she did not hear the trooper read defendant her rights, and that defendant was nervous, upset and ready to collapse. Other witnesses stated that before the police arrived, defendant was hysterical and very nervous, running up and down the road looking for help.

The unsigned statement which was generally exculpatory except in its admission that defendant was holding the shotgun when it discharged, was admitted into evidence after an *in camera* hearing, over objection of defense counsel.

There was evidence that Mrs. Gialdella and Traybor had been romantically involved, but there was also testimony that the relationship was entirely one-sided, on

the part of Traybor. Contradictory character evidence of the defendant was presented. The State police report reflected an officer's opinion that Mrs. Gialdella acted in self-defense and the material facts about the shooting were virtually undisputed.[1]

Three assignments of error are relied on for reversal: (1) the court erred in refusing to direct a verdict of acquittal or set aside the jury verdict, (2) the court erred in instructing the jury that it could return a verdict of voluntary manslaughter,[2] and (3) the court erred in admitting into evidence the defendant's unsigned statement. We need consider only the first.

*State v. Blizzard*, 152 W. Va. 810, 166 S.E.2d 560 (1969), syllabus point 2 states:

" 'In a trial upon an indictment for murder in which the defendant is convicted of voluntary manslaughter and the evidence is not sufficient

---

[1]The trial judge in his carefully considered memorandum opinion denying defendant's motion to set aside the jury verdict, stated in regard to a "circumstantial evidence" instruction:

"As to the State's Instruction E on circumstantial evidence, I believe there was circumstantial evidence in the case of very great importance—the position of the guns after the shooting, and I speak of the shotgun and the pellet gun; the fact that the deceased's fingerprints were not on the death gun, although Mrs. Gialdella testified (R. p. 285) that he had ahold (sic) of the gun. She also said that in her statement, which she made to the investigating officer, Trooper Estep (see statement, R. p. 502). Here she said "We were still arguing and he came at me again and he grabbed the gun and tried to take it away from me and it went off."

[2]State's Instruction A states:

THE COURT INSTRUCTS THE JURY that one of three verdicts may be found under the indictment in this case, voluntary manslaughter; involuntary manslaughter; and not guilty.

The Court further instructs the jury that voluntary manslaughter is the intentional, unlawful and felonious but not deliberate or malicious taking of human life under sudden excitement and in the heat of passion; that involuntary manslaughter is where one person while engaged in an unlawful act, unintentionally causes the death of another person, or when engaged in a lawful act unlawfully causes the death of another person.

to justify a verdict of guilty of voluntary manslaughter, such verdict and the sentence of imprisonment entered upon it will be set aside and reversed by the appellate court.' Point 2, Syllabus, State v. Duvall, W. Va., 106 S.E.2d 155."

The judgment here must be reversed and defendant released because the evidence was insufficient to sustain a voluntary manslaughter conviction. Her evidence supporting her self-defense defense was not materially disputed, and as a matter of law, certainly created a reasonable doubt about her guilt of either voluntary or involuntary manslaughter. *See, State v. Kirtley*, W. Va., 252 S.E.2d 374 (1978), syllabus point 4.[3] The judgment is reversed and defendant unconditionally discharged from custody. *Greene v. Massey*, 437 U.S. 19, 57 L.Ed 2d 15, 98 S.Ct. 2151 (1978).

*Reversed.*

---

[3]Our finding here is, in effect, that defendant's evidence created the reasonable doubt mentioned in *Kirtley*. However, we are convinced that the state's evidence was inadequate to sustain defendant's conviction of any crime. *See, State v. Starkey*, W. Va., 244 S.E.2d 219 (1978).