STATE OF WEST VIRGINIA

*v.*

W.J.B.

(No. 14884)

Decided March 31, 1981.

*William E. Kiger* for appellant.

*Chauncey H. Browning*, Attorney General, *and Paula D. Dean*, Assistant Attorney General, for appellee.

MILLER, JUSTICE:

W.J.B. was adjudicated as a juvenile delinquent by the Circuit Court of Wood County on its finding that he had committed voluntary manslaughter. He appeals the adjudication, challenging the sufficiency of the evidence on the grounds that the State has not met its burden of rebutting his evidence of self-defense. In reviewing the evidence in light of our prior decisions regarding self-defense, we agree.

The juvenile was arrested on February 19, 1979, following the shooting death of Michael Watson. The State filed a juvenile delinquency petition, charging him with murder. Subsequently, the State petitioned for transfer to the criminal jurisdiction of the court so that the juvenile could be prosecuted and sentenced as an adult. Following a hearing on this issue, the court denied the motion to transfer.

On March 27, 1979, the court held an adjudicatory hearing pursuant to W. Va. Code, 49-5-11, to determine the issue of delinquency.[1] The testimony at the adjudicatory hearing was substantially undisputed. Nine neighbors and relatives of the juvenile, four Parkersburg city police officers, a paramedic, and the juvenile himself testified regarding the events surrounding the February 19, 1979, death of Michael Watson. The juvenile admitted the shooting and testified regarding self-defense.

The combined, undisputed testimony established a pattern of violence on the part of Watson, directed toward the family of W.J.B. over the course of the preceding year. At the time of the alleged offense, the juvenile was 17 years old, living at home with his mother and two sisters. His father was deceased. Michael Watson, at the time of his death, was 21 years old, a Parkersburg resident on parole from the State penitentiary for a burglary conviction.

---

[1] The definition of delinquency relevant to the proceedings against W.J.B. is set forth in W. Va. Code, 49-1-4:

" 'Delinquent child' means a child:

   (1)  Who commits an act which would be a crime under state law or a municipal ordinance if committed by an adult, punishable by confinement in a jail or imprisonment."

Watson's association with W.J.B.'s family began in the spring of 1978 when he began a courtship of the juvenile's 15-year-old sister. Their relationship was a stormy and intermittent one. It appears that the 15-year-old attempted to break off the relationship after she had suffered a number of beatings at Watson's hands. This apparently led Watson to force his attention on her. On at least one occasion in the summer of 1978, Watson pursued the girl at knifepoint as she fled into her home. Watson continued the pursuit throughout the house. When the juvenile and others attempted to intervene on his sister's behalf, Watson turned with the knife and threatened W.J.B.

On a subsequent occasion, the 15-year-old and her older sister awoke when they heard Watson, in the early morning darkness, climbing on the rooftop beside their bedroom window. As the girls pushed the window closed, Watson broke through the window and chased them as they fled for protection into W.J.B.'s bedroom. Watson forced his way into the bedroom and forcibly dragged the 15-year-old from the bedroom into the family bathroom. When W.J.B. entered the bathroom behind them, Watson attacked the youth, striking him with his fists. This diversion allowed the girl to flee downstairs, where the family concealed her behind the kitchen refrigerator. Unable to locate her, Watson returned outside to the ladder he had used to climb to the roof and drove the ladder through the living-room door.

In response to these and other assaults upon her home and family, the juvenile's mother had obtained, on separate occasions, three warrants for Watson's arrest based on charges of assault and battery, destruction of personal property, and contributing to the delinquency of a minor. Apparently, no formal disposition was made in regard to any of these charges.

On the evening of Watson's death, several friends and family of the juvenile were present in the living room of the home watching television. Shortly after midnight, the juvenile's younger sister noticed Watson looking in the living-room window. As she stated, "It's Mike Watson," Watson broke in the living-room door, announcing, "You're damn right it's Mike Watson." It appeared that Watson had

been drinking. The girl fled from the room screaming, and, chased by Watson, ran into W.J.B.'s bedroom where she locked herself in and barricaded the door with furniture. Several persons ran to a neighbor's house to call the police while Watson attempted, unsuccessfully, to break into the bedroom. Upon learning that the police had been called, Watson fled out an upstairs window.

Two Parkersburg police officers responded to the call, but departed shortly thereafter, unable to locate Watson. Soon after their departure, Watson reappeared outside the house, shouting threats and challenges and throwing snowballs and other objects against the house. A passerby testified to a brief conversation that he had with Watson at this time, during which Watson appeared intoxicated and "clanked" a butcher knife and beer mug together in his hands while speaking of forthcoming "trouble."

While Watson was outside he challenged W.J.B. to come outside and fight him, but W.J.B. declined and requested that Watson leave the family in peace. During this time, the family had again concealed the 15-year-old behind a barricaded bedroom door. The juvenile took a shotgun from his room and positioned himself on a living-room chair with the shotgun placed across his legs. Two family friends remained seated elsewhere in the living room.

When Watson kicked open the living-room door a second time and confronted W.J.B., he again asked Watson to leave. Watson continued to challenge W.J.B. to fight and dared him to shoot. One of the witnesses testified that Watson held a butcher knife and tapped it against the door frame. At the trial, the juvenile testified that he did not recall seeing the knife, but that Watson's hand was obstructed from his view. Amid continued threats and profanity, Watson advanced upon W.J.B., whereupon the juvenile, without raising the shotgun from his lap, pulled the trigger, shooting Watson in the chest. He died immediately.

When the police again arrived at the house, they found Watson lying in the doorway with a knife in his hand under his body. The juvenile freely admitted the shooting, and

police took W.J.B. into custody and obtained his written statement of the incident.[2]

At the conclusion of the testimony at the adjudicatory hearing, the court found that the juvenile had committed voluntary manslaughter, and adjudicated him delinquent under W. Va. Code, 49-1-4(1). Following a disposition hearing on September 5, 1979, the court ordered that the juvenile be placed in the temporary custody of the Department of Welfare for placement in a group home facility.

The issue before this Court on appeal is whether the facts of this case are sufficient to support a finding of voluntary manslaughter in light of the testimony regarding self-defense.

The law regarding self-defense is often deceptively and simply stated: that a defendant who is not the aggressor and has reasonable grounds to believe, and actually does believe, that he is in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant has the right to employ deadly force in order to defend himself. *See State v. Kirtley*, 162 W. Va. 249, 252 S.E.2d 374, 381 n. 8 (1978); *State v. Green*, 157 W. Va. 1031, 206 S.E.2d 923 (1974); *State v. Bowyer*, 143 W. Va. 302, 101 S.E.2d 243 (1957); *State v. Preece*, 116 W. Va. 176, 179 S.E. 524 (1935); W. LaFave & A. Scott, *Criminal Law* §53 (1972).

The generality of the foregoing rule does not address in any detail the question of the "retreat" rule, an aspect of which is involved in this case where a person is assaulted in his own home. In this situation, we have recognized that a person in his own home who is subject to an unlawful intrusion and placed in immediate danger of serious bodily harm or death has no duty to retreat but may remain in place and employ deadly force to defend himself. *State v.*

---

[2] This statement was introduced at the adjudiatory hearing, but was not included in the transcript of the hearing or otherwise made a part of the record on appeal. The record, however, contains no suggestion that this statement was at variance with the juvenile's oral testimony at the hearing.

*Preece*, 116 W. Va. 176, 179 S.E. 524 (1935); *State v. Thornhill*, 111 W. Va. 258, 161 S.E. 431 (1931). This principle is sometimes called defense of habitation and springs from the English common law concept that a man's home is his castle.[3] Syllabus Point 4 of *Preece* tersely states this no-retreat rule:

> "A man attacked in his own home by an intruder may invoke the law of self-defense without retreating."

*See also Bryant v. State*, 252 Ala. 153, 39 So.2d 657 (1949); *People v. Ceballos*, 12 Cal.3d 470, 526 P.2d 241, 116 Cal. Rptr. 233 (1974); *Watkins v. State*, 197 So.2d 312 (Fla. App. 1967); *Gainer v. State*, 40 Md. App. 382, 391 A.2d 856 (1978); *People v. McGrandy*, 9 Mich. App. 187, 156 N.W.2d 48 (1967); *State v. Browning*, 28 N.C. App. 376, 221 S.E.2d 375 (1976); *Commonwealth v. Eberle*, 474 Pa. 548, 379 A.2d 90 (1977); *State v. Grantham*, 224 S.C. 41, 77 S.E.2d 291 (1953).[4]

The West Virginia cases discussing self-defense in the home are not without some confusion. While it is quite clear that we do not require the defendant to retreat before utilizing deadly force,[5] we have been rather vague on the question of whether the occupant can use deadly force even thought the intruder has not threatened the occupant with serious bodily harm or death. In *State v. Bowman*, 155 W. Va. 562, 184 S.E.2d 314 (1971), we upheld a murder conviction where the homeowner had shot his neighbor who had run onto his porch and was at the front screen door when killed. There had been no threats exchanged and the

---

[3] R. Perkins, *Criminal Law* 1022 n. 1 (2nd Ed. 1969), traces the "castle" rule to this statement:

"... 'the house of everyone is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose; ...' Semayne's Case, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (1620)."

[4] Massachusetts appears to be the only state with a contrary rule requiring a retreat in one's home. *Commonwealth v. Shaffer*, 367 Mass. 508, 326 N.E.2d 880 (1975).

[5] *E.g. State v. Toler*, 129 W. Va. 575, 41 S.E.2d 850, 853 (1946); Syl. Pt. 4, *State v. Preece*, 116 W. Va. 176, 179 S.E. 524 (1935); *State v. Thornhill*, 111 W. Va. 258, 161 S.E. 431 (1931); *State v. Manns*, 48 W. Va. 480, 37 S.E. 613 (1900).

only indicia of ill will was that earlier in the day the defendant and his wife had an argument with the deceased's wife. We characterized our prior self-defense cases in the home as follows:

> "[T]hese cases are distinguishable from the instant case, in that in those cases there was either some violent action taken or threatened coupled with spoken threats of some violent action, while in the instant case the victim made no threats and his only 'violent' actions were to come on defendant's porch at a rapid pace and reach toward the door."

In those cases cited in *Bowman*, we have basically stated that "a person has the right to repel force by force in the defense of his person, his family or his habitation, and if in so doing he uses only so much force as the necessity, or apparent necessity, of the case requires, he is not guilty of any offense, though he kill his adversary in so doing." *State v. Laura*, 93 W. Va. 250, 256-57, 116 S.E. 251, 253 (1923), referring to an instruction from *State v. Manns*, 48 W. Va. 480, 37 S.E. 613 (1900). *State v. Preece*, 116 W. Va. 176, 179 S.E. 524 (1935); *State v. Clark*, 51 W. Va. 457, 41 S.E. 204 (1902). *See also State v. Thornhill*, 111 W.Va. 258, 161 S.E. 431 (1931).

The foregoing rule on the use of force, however, is merely a bland statement of the general rule that "the amount of force which [a defendant] may justifiably use must be reasonably related to the threatened harm which he seeks to avoid." W. LaFave & A. Scott, *Criminal Law* 392 (1972). The more particular statement as to the amount of force that can be used in self-defense is that normally one can return deadly force only if he reasonably believes that the assailant is about to inflict death or serious bodily harm; otherwise, where he is threatened only with non-deadly force, he may use only non-deadly force in return. *Rose v. Commonwealth*, 422 S.W.2d 130 (Ky. 1967); *Stennis v. State*, 234 So.2d 611 (Miss. 1970); *State v. Parker*, 403 S.W.2d 623 (Mo. 1966); *State v. Pearson*, 288 N.C. 34, 215 S.E.2d 598 (1975); *State v. Clark*, 51 W. Va. 457, 41 S.E. 204 (1902); W. LaFave & A. Scott, *Criminal Law* 392-93 (1972).

A number of courts with the approval of commentators have taken the position that the occupant of a dwelling is not limited in using deadly force against an unlawful intruder to the situation where the occupant is threatened with serious bodily injury or death, but he may use deadly force if the unlawful intruder threatens imminent physical violence or the commission of a felony and the occupant reasonably believes deadly force is necessary. *Thomas v. State*, 255 Ala. 632, 53 So.2d 340 (1951); *People v. Givens*, 26 Ill.2d 371, 186 N.E.2d 225 (1962); *Burks v. Commonwealth*, 254 Ky. 193, 71 S.W.2d 418 (1934); *Lee v. State*, 232 Miss. 717, 100 So.2d 358 (1958); *State v. Couch*, 52 N.M. 127, 193 P.2d 405 (1948); *State v. Reid*, 3 Ohio App.2d 215, 210 N.E.2d 142 (1965); *Wooten v. State*, 171 Tenn. 362, 103 S.W.2d 324 (1937); W. LaFave & A. Scott, *Criminal Law* 400 (1972); R. Perkins, *Criminal Law* 1023-24 (2nd ed. 1969).[6]

We do not find any clear discussion in our cases of whether the occupant in his home may use deadly force to repel an intruder even though the intruder has not placed the occupant in fear of imminent danger of serious bodily harm or death. In *State v. Laura*, 93 W. Va. 250, 257, 116 S.E. 251, 253 (1923), we said that if the intruder was about to commit "a felony on his person or property or on someone under his protection in his house" he would be "justified in taking the life of an intruder." *See also State v. Thornhill*, 111 W. Va. 258, 161 S.E. 431 (1931); *State v. Clark*, 51 W. Va. 457, 41 S.E. 204 (1902); *State v. Manns*, 48 W. Va. 480, 37 S.E. 613 (1900).

The taking of life to prevent the commission of a felony, however, is not limited to self-defense in the home, but is part of a more general rule relating to crime prevention. W.

---

[6] "[T]here are stong reasons for recognizing the dwelling as a place of refuge in which the dweller may expect to be free from personal attack even of a nondangerous character, and the trend has been in the direction of holding that an unlawful entry of the dwelling for the purpose of an assault upon some person therein may be resisted by deadly force if this reasonably seems necessary for the purpose 'although the circumstances may not be such as to justify a belief that there was actual peril of life or great bodily harm.' " R. Perkins, *Criminal Law* 1024 (1969).

LaFave & A. Scott, *Criminal Law* 406 (1972).[7] Moreover, even though we recognize the rule that an occupant of a dwelling may justifiably kill an intruder who intends to commit a felony, where no other means to prevent it are available, this still does not answer the limited inquiry of whether the occupant may kill to prevent personal violence not amounting to a felony or a threat of death or serious bodily injury.

Despite the lack of a clear statement in our past decisions, when our cases of self-defense in the home are analyzed, it appears that we have not required the occupant to be under a reasonable apprehension of imminent danger of serious bodily harm or death in order to use deadly force on the intruder.

In *Preece,* the defendant, armed with a pistol, shot the victim as he was ascending the apartment steps unarmed and intending to assault the defendant. In *State v. Hurst,* 93 W. Va. 222, 116 S.E. 248 (1923), the victim had been drinking and intruded into the defendant's home. He knew the defendant's family since he was engaged to marry one of its members. After initially pushing the defendant on the porch, he proceeded to go into the house, slam the lid on the

---

[7] "Originally, the law was that deadly force was justifiable to prevent or terminate a felony, but was not justifiable to prevent or terminate a misdemeanor. This rule made some sense in the days when the relatively few felonies were all punishable by death anyway; but with the expansion of the felony concept to many new types of conduct, and the lowering of the penalties for many felonies, it will not do today. . . .

"The modern rule limits the right to use deadly force to 'dangerous' felonies (those felonies of the type which involve a substantial risk of death or serious bodily harm) or, as it is sometimes said, to 'atrocious' felonies involving 'violence or surprise.' . . . As to the dangerous (atrocious) felonies (e.g., murder, voluntary manslaughter, mayhem, kidnaping, arson, burglary of a dwelling, robbery, forcible sodomy, forcible rape), one is, of course, not justified in killing except when it reasonably appears necessary to kill to prevent the commission, or bring about the termination of the felony. And the commission of the felony must appear to be imminent, rather than in the more distant future, to justify the use of such force." W. LaFave & A. Scott, *Criminal Law* 406-07 (1972) (footnotes omitted).

sewing machine and engage in some cursing before returning to the porch. He approached the defendant with an upraised arm and when the defendant pushed him away, the victim reached into his pocket at which point he was stabbed by the defendant.

*State v. Laura* is much like *Preece* except that the victim had used abusive language and threatened to kill the defendant at a restaurant in a hotel operated by the defendant. The defendant, who lived in the hotel, went to his room and obtained a pistol. The deceased was killed as he started up the steps to the defendant's room. In *State v. Zannino*, 129 W. Va. 775, 41 S.E.2d 641 (1947), the victim was not visibly armed, but had his hand concealed inside his coat, and advanced on the defendant indicating he was going to "get" the defendant and was thereupon shot. He had previously threatened to kill the defendant, and a knife was found under his body.

In *State v. Panetta*, 85 W. Va. 212, 101 S.E. 360 (1919), the defendant, a woman, claimed the victim had entered her house with a key which he had previously obtained when he boarded with the defendant and her husband. He made an indecent proposal and was starting to assault her when she ran to her bedroom, seized a revolver, and shot him.

In the foregoing cases, we found that self-defense was available even though the facts did not necessarily show that the defendant home-occupant was in fear of imminent danger of serious bodily harm or death. We recognize that there are some jurisdictions which restrict the use of deadly force in the home to those situations where the intruder imminently threatens death or serious bodily harm. *E.g., Harris v. State*, 104 So.2d 739 (Fla. App. 1958); *State v. Ivicsics*, 604 S.W.2d 773 (Mo. App. 1980); *State v. McCombs*, 297 N.C. 151, 253 S.E.2d 906 (1979); *Commonwealth v. Wilkes*, 414 Pa. 246, 199 A.2d 411 (1964), *cert. denied*, 379 U.S. 939, 13 L.Ed.2d 349, 85 S.Ct. 344.

We believe that there are sound policy reasons for permitting the homeowner to repel with deadly force a violent intrusion into his home where he has reasonable grounds to believe the intruder will commit a felony or

personal injury on the occupant and that deadly force is the only means available to prevent it. First, there is still basic vitality to the ancient English rule that a man's home is his castle, and he has the right to expect some privacy and security within its confines. This rule arises from a societal recognition that the home shelters and is a physical refuge for the basic unit of society—the family. In the criminal law there is a marked recognition of this fact, as shown by the difference in the right to arrest a criminal without a warrant as between his home and a public place. *Payton v. New York*, 445 U.S. 573, 63 L.Ed.2d 639, 100 S.Ct. 1371 (1980); *State v. Craft*, 165 W. Va. 741, 272 S.E.2d 46 (1980).

Second, we believe that from the standpoint of the intruder the violent and unlawful entry into a dwelling with intent to injure the occupants or commit a felony carries a common sense conclusion that he may be met with deadly force, and that his culpability matches the risk of danger. We also recognize that there is often a certain vulnerability to the occupant of a dwelling who is forced to confront the unlawful intruder in the privacy of his home, without any expectation of a public response or help.

Finally, while it can be acknowledged that one element of a mature criminal justice system is to narrow the areas where individuals may resort to self-help in the infliction of punishment or the taking of life, no court has seen fit to abolish the concept of self-defense.

In attempting to clarify our rule in regard to self-defense in the home, we do not mean to suggest that a homeowner is now free to shoot any stranger who approaches his door or that he may answer the pounding on the door with gunfire. Even an unlawful intrusion will not be sufficient when coupled only with a vague suspicion that the intruder may intend to commit a felony or physically assault the occupant. There must be a reasonable basis for the occupant's belief.

We recognize that the reasonableness of the occupant's belief and actions in using deadly force must be judged "in the light of the circumstances in which he acted at the time and is not measured by subsequently developed facts."

*State v. Reppert*, 132 W. Va. 675, 691, 52 S.E.2d 820, 830 (1949). The reasonableness of the defendant's belief and conduct may depend on the past actions of the deceased, and for this reason the victim's history of threats, brandishing of arms, and violence toward the defendant and his family and his general reputation for violence are admissible evidence on the issue of self-defense. *See State v. Bowyer*, 143 W. Va. 302, 101 S.E.2d 243 (1957); *State v. Peoples*, 106 W. Va. 262, 145 S.E. 389 (1928); *State v. Porter*, 98 W. Va. 390, 127 S.E. 386 (1925); Annot., *Admissibility of Evidence as to Other's Character or Reputation for Turbulence on Question of Self-Defense by One Charged with Assault or Homicide*, 1 A.L.R.3d 571 (1965).

In the present case, the fact that the juvenile took the precaution of arming and positioning himself in the living room of his home after the first assault on the house and his younger sister by the victim Watson does not diminish his claim of self-defense. Those acts are consistent with the established right to arm and defend himself and his family within the confines of his own home. *State v. Preece*, 116 W. Va. 176, 179 S.E. 524 (1935); *State v. Hardin*, 91 W. Va. 149, 112 S.E. 401 (1922). We have recognized the accepted rule that the defendant may interpose the defense of self-defense in protecting a member of his family as well as in protecting himself. *State v. Wilson*, 145 W. Va. 261, 114 S.E.2d 465 (1960); *State v. Zannino*, 129 W. Va. 775, 41 S.E.2d 641 (1947).

The State's responsibility to prove beyond a reasonable doubt that the defendant did not act in self-defense, once some evidence of self-defense is presented, is established in Syllabus Point 4 of *State v. Kirtley*, 162 W. Va. 249, 252 S.E.2d 374 (1978):

> "Once there is sufficient evidence to create a reasonable doubt that the killing resulted from the defendant acting in self-defense, the prosecution must prove beyond a reasonable doubt that the defendant did not act in self-defense."

We are aware that the standard of appellate review on evidentiary matters as set out in Syllabus Point 1 of *State v. Starkey*, 161 W. Va. 517, 244 S.E.2d (1978), requires that

we view the evidence in the light most favorable to the State. Here the evidence was largely undisputed on the self-defense issue, and is substantial if not overwhelming in favor of that defense. Against a background of prior unprovoked assaults against the juvenile and his family, including threats with a knife and the destruction of physical property in the home, the juvenile sought to prevent Watson's second forced entry into the family home. He was aware that Watson had been drinking and had declined Watson's challenges to come out and fight. After the first break-in the police had been called but had not apprehended Watson, and it was at this point the juvenile armed himself. Watson's second forced entry was accompanied by threats and violence and in the face of requests to leave. Watson's advance on the juvenile was deliberately made, taunting him to shoot, and the juvenile did shoot without moving the gun from his lap. Under these circumstances, the State has failed to prove beyond a reasonable doubt that the juvenile did not act in self-defense.

This case is analogous to *State v. Milam*, 163 W. Va. 752, 260 S.E.2d 295 (1979), where the State failed as a matter of law to rebut the defendant's evidence of insanity, and *State v. Gialdella*, 163 W. Va. 60, 254 S.E.2d 685 (1979), where the State failed to rebut the defendant's evidence of self-defense. In both of these cases, we concluded that because of the State's failure to carry its burden of proof beyond a reasonable doubt, such evidentiary insufficiency bars a retrial under double jeopardy principles. *Burks v. United States*, 437 U.S. 1, 57 L.Ed.2d 1, 98 S.Ct. 2141 (1978); *State v. Frazier*, 162 W. Va. 935, 252 S.E.2d 39 (1979).

Consequently, the adjudication of delinquency is vacated and the case is remanded for an entry of a judgment of acquittal.

*Remanded for*
*judgment of acquittal.*