THE STATE OF OHIO, APPELLEE, *v.* BYNUM, APPELLANT.

(No. 3879—Decided March 16, 1942.)

*Mr. Thomas J. O'Connor,* prosecuting attorney, and *Mr. Jerome J. Jesionowski,* for appellee.
*Mr. Al E. Simmons,* for appellant.

OVERMYER, J. Appellant, Milton Bynum, was tried under an indictment returned by the grand jury of Lucas county for the crime of first degree manslaughter, the basis of the charge being that on or about March 15, 1941, he made an assault upon one James Charles and inflicted a mortal wound from which Charles died on September 19, 1941.

From a verdict of conviction by a jury and judgment and sentence thereunder, the defendant appeals on questions of law, assigning a number of errors and urging chiefly that the verdict is against the weight of the evidence and is contrary to law, particularly on the question whether the assault on about March 15th was the cause of death one hundred and eighty-eight days later, on September 19th.

There was evidence offered by the defendant tending to show that decedent suffered a blow on the head with an iron pipe in an altercation with another man some time subsequent to the event here involved. The court finally admitted this evidence, after making statements before the jury deprecatory of its pertinency or relevancy. We speak of it only to say that we consider this evidence clearly relevant for the purposes for which it was offered, which purposes were obvious.

On the date charged and involved in this appeal, Bynum and Charles had some argument at a restaurant and later at a poolroom on Canton avenue in Toledo, Ohio, and in the course of the argument Bynum, acting, he says, in self-defense, struck Charles over the head with either an iron pipe or a short "pool cue," Bynum saying it was a cue, others testifying that it was an iron pipe. There is evidence that Charles fell to the floor and that there was some blood. It is testified and undenied that Charles refused a doctor or medical aid and did not wish the police called. It is not disputed that Charles was a heavy drinker and was at the time intoxicated.

The assault occurred in the early hours of the morning and Charles shortly afterwards ate breakfast at a nearby restaurant. He continued his regular employment as a truck driver and mechanic for a scrap dealer from the time of the assault until some time in September when he began to complain of headaches, was

examined by a doctor, taken to a hospital where X-rays were taken and an operation performed. He died either during or immediately after the operation, the record not being clear on this point.

The doctor who examined and treated Charles and ordered him to the hospital in September did not testify. The doctor or technician who took X-rays at the hospital did not testify and the X-rays are not in evidence. The doctor or surgeon who performed the trepanning operation at the hospital, in the course of which or immediately following which the patient died, did not testify. Nor did the doctor who made the pathological and bacteriological examinations testify.

There is no evidence in this record, medical or otherwise, that the death of James Charles on September 19, 1941, was caused, or probably caused, by the assault at the hands of the defendant on or about March 15, 1941. The only testimony on the subject, given by the only medical witness offered, was that of the county coroner who performed an autopsy upon the body the day following death, assisted by another doctor who was not a witness at the trial. The coroner, testifying from records furnished by the hospital and by the doctor who made laboratory tests of certain tissues from decedent's head, from X-rays taken at the hospital, and from the results of the autopsy, gave the official cause of death as ''a meningitis.'' He testified that an old fracture of the skull was found, in connection with which an abcess had formed, and that if the assault of March 15th caused the fracture, which he did not know and could not say, that it ''might have been'' the cause of death on September 19th; that it ''could have been'' the cause of it; that the microorganisms inducing meningitis are staphlycoccic germs, aurens type, and that the ordinary period of incubation of that germ, after entering a wound, is three to five days; that he had no way of knowing

when the fracture occurred or when the germs might have entered the wound, he never having seen the subject in life nor until the autopsy; and that the X-rays showed an old fracture of the skull over the area of the abcess. He further stated that there were some "hemolytic changes there which were caused by a surgical operation which was done by Dr. Max Schnitker," referring to the operation hereinbefore referred to.

He further testified:

"Any form of bacteria that may be taken up in the body, either through the blood stream or through the point of entrance or through the nasal passage or through the throat may cause meningitis."

In answer to certain medical questions, the coroner, stating that he is not a bacteriologist, said:

"I believe in this case Dr. Max Schnitker [who performed the trepanning operation], Dr. Thomas Ramsey [who made the tests, bacterially, from the records of which the witness testified], and Dr. Deming [a local roentgenologist] should be called in—."

The coroner further stated that: "Meningeal symptoms from the head injury would be—develop in a week or ten days to two weeks," and when asked if it were safe to conclude that if such symptoms did not manifest themselves within that period, then the infection would be due to some other source of penetration, he said:

"It would be safe in saying that the source of infection, rather, the point of entry could have been some other source."

Further the witness testified:

"Q. You state the cause of death was what? A. Meningitis caused by a brain abcess and subsequently to a blow on the head.

"Q. How long of a period could that blow have

been in limitation,—a period of a year, six months?
A. Within a reasonable length of time.

"Q. What do you mean by—? A. By a reasonable
length of time would be in this particular case—in a
case of this nature we who have been handling this
case are inclined to think that this infection was caused
by a blow on the head, causing a fractured skull, but
we are unable to say when that fractured skull was
sustained because the time, that was in March, there
was no X-ray picture taken, the X-ray picture was
taken shortly before this man's admission to Robin-
wood Hospital. Now, I don't believe that Dr. Deming
nor Dr. Schnitker are able to say when the act of mis-
conduct took place."

Practically all of the medical questions of a hypo-
thetical character asked by the prosecution were wheth-
er it "might be possible" that the assault of March
15th caused the death of September 19th. The follow-
ing is an illustration:

"Q. It could be possible, doctor, then, that these
germs that you and Mr. Simmons [defense counsel]
spoke about, could have been through this bone frac-
ture at any time between say March 15th and Sep-
tember 19th?"

And the doctor, testifying from "the report of the
X-ray and reports of the laboratory findings" said
that would be the "natural supposition."

That the cause of death was meningitis, in the ab-
sence of any other testimony on the subject, we as-
sume; but that the meningitis causing death was the
result of any blow suffered on March 15th or there-
abouts is not supported by any competent evidence in
the record. What "might have resulted" or "could
have resulted" or a "possible result" is quite too un-
certain to support a verdict of conviction in a criminal
case.

The judgment will be reversed as not being supported by the evidence in the respects discussed.

*Judgment reversed.*

LLOYD and CARPENTER, JJ., concur.