The STATE of Ohio, Appellee,

v.

BEAVER, Appellant.

[Cite as *State v. Beaver* (1997), 119 Ohio App.3d 385.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 95–T–5354.

Decided April 28, 1997.

388

*Dennis Watkins,* Trumbull County Prosecuting Attorney, and *Deborah L. Smith,* Assistant Prosecuting Attorney, for appellee.

*Michael A. Scala,* for appellant.

NADER, Judge.

On May 12, 1995, the state filed an indictment charging appellant, Richard Darnell Beaver, with one count of murder. R.C. 2903.02. A second indictment, which was filed on June 6, 1995, contained a firearm specification pursuant to R.C. 2941.141.

The first trial was commenced on June 27, 1995. At the close of the state's case, appellant moved for a judgment of acquittal pursuant to Crim.R. 29(A), arguing that the state failed to produce enough evidence to prove that appellant caused the death of the victim, Fred Butler. The court denied the motion, after which appellant called his sister, Latanya Beaver, as a witness in order to assert a self-defense claim. Defense counsel then requested an instruction on a lesser-included offense, felonious assault. R.C. 2903.11. The trial court granted the request and instructed the jury on murder, felonious assault, the firearm specification, and self-defense. The jury returned a verdict of not guilty to the murder charge but was unable to reach a unanimous verdict on the felonious assault charge. The court later ordered appellant to be retried for felonious assault.

Appellant filed a series of motions claiming that a retrial on the felonious assault charge would violate double jeopardy, all of which the trial court denied.

The second trial began on October 11, 1995. On October 16, 1995, the second jury found appellant guilty of felonious assault with a firearm. The trial judge sentenced appellant to the maximum term of imprisonment allowed by law for the assault, eight to fifteen years, to be served consecutively to a three-year term of actual incarceration on the firearm specification. From his conviction, appellant appeals.

The appointed appellate counsel filed a brief in this matter on July 22, 1996. In back of this brief there is a section where appellant asserts four *pro se* assignments of error. On October 28, 1996, appellant's counsel filed a motion for leave to file a *pro se* supplemental brief raising five additional assignments of error. We granted leave to file this brief on November 14, 1996.

In the section of his July 22, 1996 brief prepared by the attorney, appellant asserts the following as error:

"1. The trial court erred, to the detriment of appellant, by not discharging the first case at the close of the state's evidence.

"2. The trial court erred, to the detriment of appellant, by issuing the first improper jury instructions.

"3. The trial court erred, to the detriment of appellant, by ordering a second trial, since appellant had been placed once in jeopardy.

"4. The trial court erred, to the detriment of appellant, by issuing the second improper jury instructions.

"5. The second trial verdict was against the manifest weight of the evidence."

In his first assignment of error, appellant challenges the trial court's decision, in the first trial, to deny his motion for judgment of acquittal, pursuant to Crim.R. 29(A), at the close of the state's case. Appellant repeats the argument initially made to the trial court that the state failed to produce sufficient evidence to prove that the three bullets he admitted to firing into Butler's chest, stomach, and left knee proximately caused his death.

A motion for a judgment of acquittal is properly denied when the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime had been proved beyond a reasonable doubt. *State v. Robinson* (Apr. 26, 1996), Ashtabula App. No. 95–A–0034, unreported, at 7, 1996 WL 297036, citing *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus. The evidence is to be viewed in the light most favorable to the prosecution. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.

During the first trial, the state called several witnesses who claimed that, on the night of April 7, 1995, they were at a party in the home of Robert W. Kelly at 2820 Niles Road in the city of Warren, when they heard three gunshots outside. Butler came running inside the residence and told them appellant had shot him. One witness, Joseph Ellis, testified that he saw a bullet hole in Butler's chest. Similarly, Patrolman Andre Leon of the Warren Police Department testified that, when he responded to a 9–1–1 call about a shooting at 2820 Niles Road, he found Butler lying on an interior stair of the residence with a large bullet hole in his chest. Michelle Allison, a nurse working in the intensive care unit of Trumbull Memorial Hospital, testified that Butler spent time in the intensive care unit after approximately seven hours of emergency surgery. He had tubes in his throat to help him breathe.

The Trumbull County Coroner, Dr. Theodore Soboslay, testified from Butler's hospital records that he died on May 2, 1995, twenty-five days after being shot. He stated that, according to the reports, the immediate cause of Butler's death was "hypovolemic shock, acute respiratory failure, multiple organ failure, [and] sepsis." He explained that Butler had died as a result of a number of problems. First, he lost a lot of blood. What was left in his system was insufficient to carry enough oxygen, so his cells and his organs died. Second, his lungs were filed with fluids so Butler could not breathe. Third, Butler contracted sepsis, which is an infection caused when bacteria enters the bloodstream. Dr. Soboslay was not permitted to testify as to what caused these problems.[1] Because he had not yet rendered a formal verdict,[2] Dr. Soboslay admitted on cross-examination that he could not officially say whether Butler died of suicide, homicide or in an accident.

Now we must determine whether this evidence produced at the first trial, when viewed in a light most favorable to the prosecution, was such that reasonable minds could have reached different conclusions as to whether the state proved beyond a reasonable doubt that the three bullets caused Butler's death.

---

1. Actually, Dr. Soboslay was reading from the discharge reports generated by the hospital and said that these were "secondary to gunshot wound," meaning that the shock, organ failure, blood loss, and infection were caused by gunshot wounds. Apparently, there was some sort of understanding among the parties that Dr. Soboslay would not testify as to the causal relationship between the gunshots and the subsequent complications, but no written motion or oral discussion of this agreement appears in the record. Defense counsel successfully moved the court to strike that portion of his testimony in which he indicated that the immediate cause of death was "secondary to gunshot wound." The court also instructed the jury to disregard the statement.

2. The body had been shipped to Summit County for a coroner there to conduct the actual autopsy. At the time Dr. Soboslay testified, the autopsy report had not been completed, so he had nothing on which to base a coroner's verdict.

■ A causal connection between the criminal agency and the cause of death is an essential element in a conviction for murder in the first or second degree. *State v. Cochrane* (1949), 151 Ohio St. 128, 38 O.O. 575, 84 N.E.2d 742, paragraph one of the syllabus. Causation must be both direct and proximate. As explained by one treatise:

"Where the statute involves a specified result that is caused by conduct, it must be shown, as a minimal requirement, that the accused's conduct was an antecedent 'but for' which the result in question would not have occurred. This means that an accused's conduct must at least be a physical cause of the harmful result. But mere physical causation is not always enough; a particular physical cause is enough only when it is a cause of which the law will take cognizance. This idea has been implemented by requiring that the harmful result in question be the natural and probable consequence of the accused's conduct; if the physical causation is too remote, the law will not take cognizance of it." 1 Torcia, Wharton's Criminal Law (15 Ed.1993) 146–48, Section 26.

There were a number of problems with the state's proof of direct causation.

■ First, there was no coroner's verdict. Under R.C. 313.19, the coroner's verdict constitutes the "legally accepted cause of death." It establishes the physiological cause of death and the immediate mechanical, chemical, or biological means by which the death was caused; it does not, however, assign criminal responsibility for the death. *State v. Cousin* (1982), 5 Ohio App.3d 32, 5 OBR 34, 449 N.E.2d 32. Although the coroner's verdict is entitled to much evidentiary weight on the issue of causation, *State v. Manago* (1974), 38 Ohio St.2d 223, 227, 67 O.O.2d 291, 293, 313 N.E.2d 10, 13–14, it is not indispensable in order to prove that an accused has committed murder, as the causal relationship between the acts of the accused and the victim's death may be proved by other evidence. See *id.* at 228, 67 O.O.2d at 293–294, 313 N.E.2d at 14.

There was other evidence that Butler died as a result of four ailments: blood loss, organ failure, fluid-filled lungs, and an infection. The link between these conditions and the death was adequately supported by Dr. Soboslay's testimony to that effect. Unfortunately, there was no expert medical testimony establishing the link between the shooting and these complications, which was the second problem with the state's proof.

The cases in this area are in agreement that the state must produce evidence to support each link in the chain of causation between the defendant's criminal act and the eventual death of the victim. For example, in *State v. Burke* (1995), 73 Ohio St.3d 399, 404, 653 N.E.2d 242, 247–248, the court upheld a murder conviction against the defendant's challenge that the state failed to prove causation because the coroner clearly testified that the defendant's act of

stabbing the victim twelve times caused an irregular heartbeat, which, in turn, caused the victim's death.

Contrast this case with *State v. Bynum* (1942), 69 Ohio App. 317, 24 O.O. 86, 43 N.E.2d 636, where the defendant was accused of first-degree manslaughter. The evidence showed that he smashed the victim over the head with a lead pipe on March 15, 1941. Thereafter, the victim apparently recovered to some degree. He continued to work at this job and died mysteriously some one hundred eighty-eight days after the assault. The coroner testified that the immediate cause of death was meningitis, which could possibly have been caused by bacteria entering the lining of the brain through the seams of an old skull fracture. He testified that the blow delivered by the defendant "might have been" or "could have been" the cause of death. On appeal, the Lucas County Court of Appeals reversed the conviction as being unsupported by the evidence, stating:

"That the cause of death was meningitis, in the absence of any other testimony on the subject, we assume; but that the meningitis causing death was the result of any blow suffered on March 15th or thereabouts is not supported by any competent evidence in the record. What 'might have resulted' or 'could have resulted' or a 'possible result' is quite too uncertain to support a verdict of conviction in a criminal case." *Id.* at 321, 24 O.O. at 88, 43 N.E.2d at 638.

In the instant case, there was no direct evidence that the shooting caused the blood loss, organ failure, fluid in the lungs, and infection. For some reason, Dr. Soboslay was not permitted to testify that the one caused the others.

There was circumstantial evidence, however, upon which the jury could have inferred that the shooting caused these complications. Butler was shot three times, once in his chest, an extremely vital portion of his body. Expert medical evidence is not necessary in cases where the injuries are severe enough that the jury can infer that the injuries caused the death. *State v. Carter* (1992), 64 Ohio St.3d 218, 226, 594 N.E.2d 595, 601. There was testimony that Butler underwent emergency surgery for seven hours immediately after the shooting, and that he had trouble breathing. Unlike the victim in *Bynum*, Butler never recovered, dying some three weeks after the shooting from complications that are easily understood as normally following such injuries, *e.g.*, shock, blood loss, and organ failure. A defendant is not relieved of culpability for the natural consequences of inflicting serious wounds on another merely because the victim later died of complications brought on by the injury. *State v. Tanner* (1993), 90 Ohio App.3d 761, 771, 630 N.E.2d 751, 757.

There was enough circumstantial evidence presented in the first trial upon which the jury could rationally infer that the shooting caused the various complications. The judge's decision to send the case to the jury cannot be

reversed on this ground. See *Cochrane, supra,* 151 Ohio St. at 130–131, 38 O.O. at 575–576, 84 N.E.2d at 742 (in an equally weak case, the court stated in dicta that the issue of causation was properly submitted to the jury); *State v. Swiger* (1966), 5 Ohio St.2d 151, 155–156, 34 O.O.2d 270, 272–273, 214 N.E.2d 417, 421–422 (evidence of causation, although weak, was sufficient to go to the jury).

The third problem with the state's proof of direct causation deals with Dr. Soboslay's comments about sepsis, the infection which he listed as one of the four immediate causes of Butler's death. Dr. Soboslay said the infection was a result of a "dirty surgery." After closely reading the transcript, we think he meant to say that when the emergency room physicians cut into his abdominal cavity to retrieve bullets, they found that his injuries had contaminated his abdominal cavity. In the second trial, there was evidence that the first bullet punctured Butler's large intestine, thereby spilling bacteria into the abdominal cavity as well as the bloodstream, but this fact was not revealed to the first jury. The state did not fully explain the cause of the infection, which probably confused the jury. Counsel for the defense suggested, on cross-examination of the coroner, that the infection could have been caused by the negligence of the surgeons, but there was no evidence to that effect. He repeated the suggestion during closing argument. We believe that, because of this misunderstanding, the first jury believed that there was reasonable doubt as to whether the shootings or the infection caused Butler's death and, therefore, acquitted appellant of murder.

Assuming *arguendo* that the infection was, in fact, caused by the negligence of the attending surgeons, this alone is not sufficient to break the chain of direct causation. The injuries inflicted by the defendant need not be the sole cause of death, as long as they constitute a substantial factor in the death. *State v. Johnson* (1977), 60 Ohio App.2d 45, 52, 14 O.O.3d 24, 28–29, 395 N.E.2d 368, 373–374, affirmed (1978), 56 Ohio St.2d 35, 10 O.O.3d 78, 381 N.E.2d 637. "It is the general rule that one who inflicts injury upon another is criminally responsible for that person's death, regardless of whether different or more skillful medical treatment may have saved his life." *Id.,* 56 Ohio St.2d at 40, 10 O.O.3d at 81, 381 N.E.2d at 640. Only gross negligence or willful maltreatment will relieve the defendant from liability. *Id.* Simple negligence is not enough.

Another weakness relates to the state's proof of proximate causation—the fact that there was a lapse of twenty-five days between the shooting and Butler's death. Of course, the case for proximate causation is strongest if the victim dies immediately or shortly after being injured by the defendant. But if the victim lingers for a substantial period of time, there may arise a question whether the death came at a time too remote from the injury to say for certain that the accused caused it. The common law adhered to a principle known as the

"year-and-a-day" rule, whereby an accused could not be convicted of murder if the victim lived for a year and one day after the injury. 3 Katz & Giannelli, Criminal Law (1996) 301, Chapter 96.3.

This rule is not followed in Ohio. See *State v. Sandridge* (C.P.1977), 5 O.O.3d 419, 365 N.E.2d 898 (indictment charging the defendant with murdering the victim, who died twenty-three months after the assault, would not be dismissed under the common-law rule). Today, the length of time between the act and the result is only one consideration in assessing the prosecution's showing of proximate cause. See *Swiger*, 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417 (evidence sufficient to present a jury question as to proximate causation although, among other factors, victim's death occurred fifteen days after a beating administered by the accused).

In this case Butler died twenty-five days after the shooting. This evidence, when combined with other factors such as the severity of the wounds, the fact that Butler was in intensive care, and that he was never discharged from the hospital, is sufficient to say that reasonable minds may have reached different conclusions as to whether the shooting was the natural and proximate cause of the death.

In summary, none of the defects in the state's proof of causation was fatal to its case. The trial court committed no error in overruling appellant's motion for judgment of acquittal in the first trial. For these reasons, appellant's first assignment of error lacks merit.

 In his second assignment of error, appellant argues that the felonious assault instruction in the first trial was unwarranted because felonious assault is not a lesser included offense of murder.[3] But the record plainly shows that defense counsel requested the felonious assault instruction. Any error in relation to a jury instruction specifically requested by the defense is invited, and, in order to prevent a party from inducing the trial court to commit an error and later take advantage of it on appeal, we deem any error that may have resulted from a requested instruction as being waived. *State v. Sallee* (July 19, 1991), Ashtabula App. No. 90–A–1512, unreported, at 6–7, 1991 WL 132186.

---

3. Appellant argues, essentially, that he was not charged with felonious assault under R.C. 2903.11(A)(2), assault with a deadly weapon, but under R.C. 2903.11(A)(1), assault causing serious bodily harm. Appellant says that the instruction on felonious assault was not warranted by the evidence at trial because, although there was hearsay testimony of the victim to the effect that appellant shot him, there was no evidence that the gunshot caused serious bodily harm. Had we reached this argument we would have rejected it out of hand, as there were two witnesses who testified that they saw a bullet hole in Butler's chest and a third who testified that Butler died, which amounts to serious physical harm.

■ Appellant also argues under this assignment of error that the court erroneously instructed the jury on a firearm specification because there was no specification in the indictment filed May 12, 1995. However, the second indictment filed on June 6, 1995 contained a firearm specification. Therefore, the court did not err in charging the jury in that regard.

For the foregoing reasons, appellant's second assignment of error lacks merit.

■ In his third assignment of error, appellant asserts that retrial after the jury acquitted him of a greater offense but did not render a verdict on a lesser included offense violated his constitutional right against double jeopardy. Appellant relies on *Burks v. United States* (1978), 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1, as authority for that proposition. In *Burks,* the defendant was convicted of armed robbery. The court of appeals reversed his conviction on the ground that the evidence was insufficient as a matter of law to rebut the defendant's insanity defense and that, therefore, the evidence was insufficient to sustain the jury verdict. Afterwards, the state attempted to retry the defendant on the same charge. The Supreme Court of the United States held that the Double Jeopardy Clause of the Fifth Amendment prohibited retrial under these circumstances. Once the reviewing court determined that the evidence was insufficient, it should have entered a judgment of acquittal; it should not have remanded the cause for the trial judge to decide whether or not to hold a new trial. *Id.* at 18, 98 S.Ct. at 2150–2151, 57 L.Ed.2d at 14. If the proper judgment had been entered, it would have terminated the state's case, and the defendant could not be tried again on the same charge after the acquittal. *Id* at 10–11, 98 S.Ct. at 2146–2147, 57 L.Ed.2d at 8–10.

Appellant argues that *Burks* can be read to exclude all retrials after the jury has failed to reach a verdict. Appellant suggests that, in some sense, the prosecution did not prove that he committed the murder to the jury's satisfaction, and it would contravene the spirit of the Double Jeopardy Clause to afford the state a second chance to prove that he committed felonious assault by firing three bullets into the victim, thereby causing him serious physical harm, after the state attempted to prove in the first trial that appellant fired three bullets into Fred Butler, causing his death.

Even if we were to overlook appellant's admission that he shot Butler and pretend that the state failed to adequately prove that he was the shooter, we could not agree with appellant's rather strained double jeopardy claim. This very same argument has been rejected by the Supreme Court of the United States. In *Richardson v. United States* (1984), 468 U.S. 317, 325, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242, 250–251, the court held that *Burks* could not be read as generally forbidding a second trial where the jury returns a partial verdict in the first, *i.e.,* where it acquits the accused on one charge but is unable to reach a

verdict as to others. The court reasoned that the jury's failure to reach a verdict is not an event which terminates the original jeopardy on the lesser offense, and that retrial is permissible because it does not constitute a second jeopardy.

The courts in Ohio have similarly held that the United States Constitution does not prevent a defendant from being retried on a lesser included offense when the first jury acquitted the accused of a greater offense but was unable to agree on the lesser. *State v. Sanford* (Dec. 3, 1993), Wood App. No. 92WD057, unreported, 1993 WL 496595; *State v. Green* (Sept. 17, 1992), Franklin App. No. 92AP-447, unreported, 1992 WL 229510; *State v. Walker* (Sept. 23, 1987), Summit App. No. 13172, unreported, 1987 WL 17921; *State v. Davidson* (June 22, 1983), Hamilton App. Nos. C–820647, C–820677 and C–820678, unreported, 1983 WL 8912. We agree for the reasons stated in *Richardson.*

Appellant has not suggested that a different result is required under the Ohio Constitution or a statutory enactment, as was considered in *Walker, supra.*

For the foregoing reasons, we reject appellant's third assignment of error.

In his fourth assignment of error, appellant argues that it was plain error for the trial court to have failed to give the jury an instruction on aggravated assault in the second trial even though appellant's trial counsel never requested such a charge. We disagree.

There are two reasons why the trial court could not have given the instruction, even if appellant had timely requested it. First, we have noted on previous occasions that, in most cases, an aggravated assault instruction is incompatible with instructions on self-defense, so that both cannot be given together. *State v. Jones* (May 12, 1995), Trumbull App. No. 94–T–5021, unreported, at 7, 1995 WL 378663; *State v. Smith* (Jan. 14, 1993), Ashtabula App. No. 92–A–1695, unreported, at 5, 1993 WL 58705.[4]

Second, the evidence was insufficient to warrant an aggravated assault instruction. In *State v. Shane* (1992), 63 Ohio St.3d 630, 590 N.E.2d 272, the court held that an aggravated assault instruction can be given only when the evidence shows that there was an objectively sufficient provocation. If so, "the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *Id.* at 634, 590 N.E.2d at 276.

---

4. Several members of this court, including this writer, believe that an aggravated assault instruction could be given in a self-defense case where circumstances are such that the defendant exceeded the amount of force necessary for his defense, out of passion or rage. See *State v. Cripple* (Sept. 21, 1990), Portage App. No. 89–P2060, unreported, 1990 WL 136624 (Christley, J., dissenting); *Smith, supra* (Nader, J., concurring). Accord *Isaac v. Engle* (C.A.6, 1980), 646 F.2d 1129.

■ There was no evidence in the second trial suggesting that appellant was "under the influence of sudden passion or in a sudden fit of rage" as is required by R.C. 2903.12. He testified during the second trial that he was emotionally level during the encounter, and tried to calm Butler down. He only fired "instinctively" in order to save his life. Thus, the evidence presented demonstrated an insufficient emotional response to warrant an aggravated assault instruction. *State v. Hudson* (1993), 86 Ohio App.3d 113, 118, 619 N.E.2d 1190, 1193–1194.

For all of the foregoing, appellant's fourth assignment of error lacks merit.

■ In his last assignment of error, appellant argues that his conviction is against the manifest weight of the evidence. In determining whether a verdict is contrary to the manifest weight of the evidence, we review the entire record, weigh all the evidence and reasonable inferences stemming therefrom, and consider the credibility of the witnesses. *State v. Schlee* (Dec. 23, 1994), Lake App. No. 93–L–082, unreported, at 11, 1994 WL 738452. We do this to determine if, in resolving the conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*

Appellant never disputed the fact that he shot Fred Butler three times. There appears to be no argument that Butler suffered serious physical harm as a result of the shooting. The only question appears to be whether the jury clearly lost its way in rejecting appellant's claim that it was necessary to shoot Butler to preserve appellant's own life.

Near the end of the second trial, appellant took the stand in his own defense. He stated that in the early morning hours of April 7, 1995, he, his wife, and her cousin, one Terry Ball, all went to Kelly's residence. There was evidence in the first trial that Kelly ran a "hootch house," or an informal social club where he sold liquor while his patrons played cards or watched television. The trio left Kelly's and drove to various other residences that are irrelevant to this appeal. Appellant dropped off his wife at their home, after which he and Ball decided to return to Kelly's.

In the process of going back to Kelly's, appellant came across his sister, Latanya Beaver, standing next to her car on Draper Street in the Fairview Gardens housing project. He saw that his sister had been crying and pulled up close to her car to determine the reason. His sister indicated that the man standing nearby (Butler) had just punched and robbed her. Appellant got out of his car and exchanged words with Butler. Butler was angry and came toward appellant in a threatening manner. Appellant pulled his gun and merely showed Butler that he was armed. Butler continued to advance and stopped only when

appellant pointed the gun at him. Appellant apologized to Butler for any inconvenience he may have caused him, and told his sister to get in her car and follow him. As they were leaving, Butler told Latanya, "You're hit," meaning he threatened to kill her.

Appellant drove to another "hootch house," called Little Mac's, but his sister warned him not to enter. They returned to Kelly's. Appellant stated that, after they parked, he argued with his sister, lecturing her about being down in Fairview Gardens at night, purchasing drugs. He told her to go home. She and Ball got in her car and left.

Appellant got into his Cadillac and turned onto Benton Street. Suddenly, Butler jumped out from behind some nearby bushes and leapt in front of appellant's car. Appellant slammed on his brakes. Butler came around to the driver's side. He was still fuming and asked if appellant was "ready to die." Appellant told him to forget the incident, and began to pull away. Suddenly, Butler grabbed for the driver's side door handle while, with his other hand, he reached for a gun in the waistband of his shorts. Instinctively, appellant pulled the .357 magnum from underneath the armrest, leaned over to his right and fired three shots out the window, at point-blank range. Appellant thought that the first shot struck Butler because he grabbed his belly, groaned loudly, and backed off a step. Appellant remembered that his car was moving and thought that he had taken his foot off the brake while firing the second and third shots. After firing his gun, appellant drove away. As he was leaving, he saw Butler still on his feet.

Latanya Beaver also corroborated parts of this testimony. At approximately 3:45 a.m., on April 7, 1995, she drove into Fairview Gardens to purchase crack cocaine from her regular drug dealer. Butler was with him. The two men entered her car, but the regular dealer could not sell her cocaine, for some undisclosed reason. Butler had some crack for her. They agreed on a deal wherein she would purchase two rocks for $40. Butler left her car, went to a garbage can, and retrieved a bag of drugs stashed there. When he reentered her car, she saw that he had a pistol tucked into the waistband of his pants. Butler gave her only one of the rocks. She complained. Butler then punched her and demanded the $40. She surrendered the cash, after which Butler got out of the car and walked to an apartment building nearby.

For some reason, Butler ran back and jumped in front of her car as Latanya was trying to leave. Although it is unclear from the testimony, it would appear that she exited the car. Latanya testified that he was yelling at her when her brother arrived. She said that Butler and appellant exchanged words. Appellant pulled a gun to stop Butler from advancing. Butler threatened to kill her, which made her very frightened. She got back in her car and followed appellant

to Little Mac's. She flashed her headlights at appellant to warn him not to go in the house. (Butler's cohorts frequented that establishment—there could have been trouble.) She followed appellant back to Kelly's, when he began "fussing" at her. Just then, she saw Butler approaching, warned her brother, got in her car, and left the scene. She did not witness the actual shooting.

Appellant's version of events contradicts the physical evidence. Dr. William Anthony Cox, a coroner with the Summit County Coroner's office, testified that he conducted an autopsy on Butler, on May 2, 1995. There were four bullet wounds on Butler's corpse.

The first was an entrance wound at the left groin area. The bullet entered the front of the lower abdominal cavity, passed through some small intestines, and punctured the descending colon. The bullet lodged in the muscles lining the rear portion of the stomach cavity.

The second wound was another entrance wound. This bullet entered the lower left portion of Butler's chest at a downward angle. It passed through his left lung, then punctured his liver, stomach, and left kidney.

This bullet also caused the third wound, an exit wound in the area near Butler's left rear pocket. Dr. Cox testified that the exit wound had a black abrasion ring around its edge. He said that the only way an abrasion ring could have formed around an exit wound was if the skin had been pressed up against a hard surface when the bullet exited the body. The exiting projectile pressed the skin against the surface with such force as to severely bruise it. The bullet punches through the bruised area, leaving a hole in the middle of the blackened skin. When the area is examined, it looks as if there is a black ring around the exit wound.[5]

The fourth wound to Butler's left knee was at a similar downward angle where the bullet merely grazed him.

Dr. Cox testified that, in his opinion, the wound to Butler's groin came first, which knocked him flat. The other two bullets were fired into him while Butler was lying on the concrete in the street. The angle of the wounds indicated that the shooter stood above Butler's head. On cross-examination, Dr. Cox rejected suggestions by defense counsel that the abrasion ring could have been caused by tight jeans and that it could have formed if Butler had been sitting on the ground.

If the shooting had occurred as appellant described it, all three bullets would have struck Butler as he stood erect next to the driver's side door. In this position, there was nothing hard and unyielding behind Butler that could have produced the abrasion ring around the exit wound near his left rear pocket. Also, the three shots were fired directly out the window and in the general

---

5. Forensic pathologists call this a "shore wound."

direction of Butler's waist, as claimed by appellant, how could one have struck him in the knee?

Besides these physical inconsistencies, the shooting could not be justified as self-defense even if the incident took place just as appellant described it. He testified that he was in his car and had to apply the brakes in order to speak with Butler. There appeared to have been nothing preventing him from retreating by simply driving away once Butler came out from in front of the Cadillac. Similarly, under the facts testified to by appellant, he could have driven away when Butler reached for the door or his gun. Even after the first shot, there appeared to be another window of opportunity wherein appellant should have made good his escape. He testified that, after the first bullet struck Butler, he groaned, clutched his belly, and stepped back. At that point, appellant could have driven away instead of firing twice more. Under these circumstances, appellant violated his duty to retreat. See *State v. Berkman* (Aug. 16, 1991), Lake App. No. 90–L–15–131, unreported, 1991 WL 157622 (after an argument between motorists, defendant violated a duty to retreat by shooting the other motorist, who got out of his car as if to fight, instead of simply driving away). If the shooting occurred as the physical evidence suggests, appellant could not justify firing two more bullets into a man lying on his back on the ground.

In *State v. Lewis* (July 10, 1992), Trumbull App. No. 91–T–4603, unreported, 1992 WL 191967, we rejected the self-defense claim of a man who had been in a bar fight, knocked his assailant down to the ground, and then kicked him twice more for good measure. We stated that if it appears that an assailant is no longer able to kill or to do great bodily harm, "then the defendant, having notice of his adversary's position, is relieved of the danger, and the right to use force in self-defense is ended. If he continues the fight, he becomes the aggressor, and a subsequent injury to another is unlawful." *Id.* at 5, citing *State v. Reid* (1965), 3 Ohio App.2d 215, 223, 32 O.O.2d 316, 320, 210 N.E.2d 142, 148.

Thus, even if the first shot were necessary, it appears that the other two were not.

Upon the evidence submitted in the second trial, we hold that the jury did not clearly lose its way or create a manifest miscarriage of justice in rejecting appellant's self-defense claim and in convicting him of felonious assault.

Appellant's fifth assignment of error lacks merit.

We will not consider the assignments of error raised in appellant's first *pro se* brief filed without leave of court on July 22, 1996. No accused has the constitutional right to act as his own co-counsel where the state has appointed an attorney to represent him. *State v. Thompson* (1987), 33 Ohio St.3d 1, 6, 514 N.E.2d 407, 413–414; contra *Myers v. Collins* (C.A.5, 1993), 8 F.3d 249, 252. An

appellate court has discretion whether to address arguments raised in an appellant's *pro se* brief upon appeal. See *State v. White* (1991), 71 Ohio App.3d 550, 551, 594 N.E.2d 1087, 1088, fn. 1. This court adheres to a policy whereby appellants must submit all filings through appointed counsel, and we will not consider arguments raised in *pro se* briefing unless we have granted leave to file a supplemental brief. Since appellant's attorney neglected to secure our permission before attaching appellant's *pro se* brief to his own, we will not consider the issues raised therein.

As for the second *pro se* brief filed instanter, by our leave on October 28, 1996, we have reviewed the contentions raised therein. They are merely duplicative of the issues raised by the appointed attorney. Because we have fully considered the merits of the claims raised in the attorney's brief, we reject appellant's *pro se* arguments without further comment.

The judgment of the trial court at issue here and appellant's conviction for felonious assault are hereby affirmed.

*Judgment affirmed.*

FORD, P.J., and CHRISTLEY, J., concur.