JOURNAL ENTRY and OPINION
Appellant Dennis Harris, aka Khaleel Shabazz, appeals from his conviction of murder of Vasel Bruce Glass and grand theft of Glass's 1997 Ford Ranger truck. Harris asks this court to vacate his convictions on grounds that the trial court erred in denying his motion to suppress evidence, denying his Crim.R. 29 motion for acquittal, convicting him contrary to the manifest weight of the evidence, and convicting him in light of prejudicial prosecutorial misconduct. Harris assigns the following as errors for our review:
 I. THE TRIAL COURT ERRED DENYING THE APPELLANT'S MOTION TO SUPPRESS EVIDENCE.
 II. THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL.
 III. THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 IV. APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BASED UPON MISCONDUCT OF THE PROSECUTING ATTORNEY.
Having reviewed the record and legal arguments of the parties, we affirm the decisions of the trial court. The apposite facts follow.
On November 22, 1999, the Cleveland Heights Police Department assigned Officer Kurt Nebe to conduct a welfare check at 858 Lecona Avenue, Cleveland Heights, Ohio following a report that mail had been accumulating at this address for about one week. Upon his arrival at 858 Lecona Avenue, Officer Nebe noticed no vehicle in the driveway, no signs of forced entry into the residence, and no signs of ransacking. Officer Nebe found Glass's dead body in his bedroom covered by several layers of blankets. The Cleveland Heights police secured the residence and removed Glass's body and several items of evidentiary value including a knife wrapped in a towel, an empty whiskey bottle covered by a tee-shirt, and a telephone cord.
Phone records seized by the Cleveland Heights Police Department revealed several phone calls placed from Glass's home to a residence in Wooster, Ohio occupied by Sandra Chrostowski, a friend of Harris's. The last of these calls occurred at 10:18 PM on November 14, 1999. On December 2, 1999, the police informed Chrostowski that Glass had been murdered at his residence and that Harris was a suspect. Also at this time, Chrostowski agreed to record any further telephone conversations with Harris. Chrostowski confirmed the last phone call she received from Harris was placed from Glass's house. During that conversation, an argument occurred between Harris and Glass. Harris told her he would take care of it, and the phone connection then terminated. She next heard from Harris on 18 November 1999 when he called to ask her to come get him and take him to Wooster. On 22 November 1999, Harris called Chrostowski sixteen times, asking her to come get him and take him to Wooster. Although the taped conversations were inadvertently erased, Chrostowski testified that during one of her conversations with Harris, he told her that his fingerprints would be on the knife and whiskey bottle, and that he had taken Glass's truck and did not return it.
On 22 November 1999, the Cleveland Police dispatched Sargent Harold Pratel to E 123rd Street where he discovered Glass's abandoned pick-up truck. The vehicle was mostly stripped, but lacked ignition damage, indicating the vehicle was last driven using keys. Witness testimony revealed Glass's vehicle was abandoned sometime between 15 and 19 November 1999.
On 8 December 1999, Captain Michael Cannon and Chief Martin Lentz of the Cleveland Heights Police Department transported Harris from Lorain County Correctional Institution, where he had been since turning himself in for a probation violation, to the Cleveland Heights police station. While in transit, Harris initiated conversation with the officers, inquiring as to the purpose of his transport. Captain Cannon said that the Cleveland Heights police wished to ask him some questions about the death of Vasal Glass. Harris responded, "Vasal is dead," at which time Captain Lentz read Harris his Miranda[1] rights. Harris acknowledged that he understood these rights and proceeded to voluntarily inform the officers that he lived with Glass, that his fingerprints would be in the house including on the whiskey bottle and knife, and that he last saw Glass at 6:30 PM on 14 November 1999.
When they arrived at the police station, Captain Cannon read Harris hisMiranda rights to which Harris acknowledged his understanding. Harris then provided and signed a written statement in which he admitted living with Glass, and that Glass recently asked him to move out. After Harris completed his statement, Captain Cannon left Harris with Detectives Howard and Gurich. The detectives read Harris his Miranda rights, which he again stated he understood. Harris voiced his desire to issue a statement and asked for an attorney. At this time the interview ceased and the detectives called Captain Cannon, who was in charge of the investigation, back into the room. Captain Cannon asked Harris if he wanted to give a statement. Harris responded, "I want to give a statement, because I was provoked."
The expert testimony of various witnesses revealed the following. On a date between 14 and 18 November 1999, Glass suffered five sharp penetration wounds to his torso and hand and three blunt instrument wounds to his head before ultimately dying of ligature strangulation. The knife and the whiskey bottle both tested negative for fingerprints due to the materials wrapped around them. The knife caused the sharp penetration wounds and the whiskey bottle caused the blunt head wounds. The telephone cord used to strangle Glass also tested negative for fingerprints. Harris's finger and palm prints were found on Glass's bedroom door jamb and his bathroom faucet.
On 5 September 2000, a Cuyahoga County jury convicted Harris of the murder of Vasal Glass and theft of Glass's pick-up truck. This appeal followed.
In his first assigned error, Harris argues the various statements he made while in the custody of the Cleveland Heights Police were taken in violation of his Miranda rights. We disagree.
At a suppression hearing, the trial court assumes the role of trier of fact. Accordingly, the trial court determines the credibility of witnesses and weighs the evidence before it. Upon review, we examine the record to determine whether substantial evidence exists to support the trial court's decision.[2]
The Miranda rights are designed to protect an individual's Fifth Amendment right against compelled self-incrimination.[3] These rights include the right to remain silent and to have counsel present during questioning.[4] In a custodial setting, a suspect must be informed of his Miranda rights before interrogation commences.[5] A suspect may waive these rights if done "knowingly, intelligently, and voluntarily."[6]
 State v. Knuckles[7] provides specific guidance relevant to Harris's appeal. In Knuckles, the Ohio Supreme Court stated:
 Once an accused invokes his right to counsel, all further custodial interrogation must cease and may not be resumed in the absence of counsel unless the accused thereafter effects a valid waiver or himself renews communication with the police.[8]
Further,
 When a statement, question or remark by a police officer is reasonably likely to elicit an incriminating response from a suspect, it is an interrogation.[9]
Here, Harris does not challenge whether he waived his Miranda rights. Rather, he focuses on whether the police timely apprised him of hisMiranda rights while in transit from LCI and whether the police failed to cease interrogation after he asserted his right to counsel while at the Cleveland Heights police station.
While in transit from Lorain Correctional Institution, a custodial setting certainly existed; however, the police officers did not initiate any form of interrogation. Rather, Harris initiated conversation with the officers asking them the purpose of transport. Upon being informed that Glass was dead and the police wished to ask him about the death, Harris responded, "Vasal is dead?" Chief Lentz then read the Miranda rights to Harris, apparently recognizing the custodial situation and the potential for Harris to offer incriminating remarks. Harris acknowledged he understood those rights and then knowingly, intelligently, and voluntarily waived his Miranda rights and spoke to the officers regarding his relationship with Glass. This process was completely compliant withMiranda. When Harris uttered, "Vasal is dead?" no interrogation had begun; the remark was purely a voluntary statement by Harris. Further, the statements Harris made after he acknowledged understanding of hisMiranda rights were the product of a knowing, intelligent, and voluntary waiver. Accordingly, substantial evidence exists to support the trial court's decision to not suppress Harris's statements while in transit from Lorain Correctional Institution.
While at the Cleveland Heights police station, Captain Cannon read Harris his Miranda rights. Harris, in writing, acknowledged that he read and wrote the English language, understand his rights, and wished to make a statement. Harris then waived his rights and issued a written statement which he signed. Detectives Howard and Gurich further interrogated Harris until he requested an attorney. At that point, the officers summoned Captain Cannon who asked Harris if he wanted to give a statement. Because Harris already asserted his right to counsel, Harris's response to Captain Cannon's question would be inadmissible as a product of compelled self-incrimination if Captain Cannon's question was reasonably likely to elicit an incriminating response from Harris.[10] However, Captain Cannon's statement was a non-substantive question asked by the officer in charge of the investigation who was not present when Harris requested counsel. The question, "Do you wish to make a statement?" was not reasonably likely to elicit an incriminating response, and thus not violative of Harris's Miranda rights.
Because Harris's Miranda rights were not violated while in transit from Lorain Correctional Institution or while in custody at the Cleveland Heights Police Department, Harris's first assigned error is without merit.
In his second assigned error, Harris argues the trial court erred in denying his motion for acquittal under Crim.R. 29(A) which provides:
 The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. * * *.
A motion for a judgment of acquittal is properly denied when reasonable minds can reach different conclusions as to whether each material element of a crime had been proved beyond a reasonable doubt.[11]
In order to convict Harris of murder under count one, the state had to prove that he purposefully caused Glass's death.[12] As both parties acknowledge, the prosecution did not present any direct evidence of Harris's guilt; however, this is not fatal to the prosecution's case. Circumstantial and direct evidence hold the same probative value and may be sufficient to support a conviction if they permit a trier of fact to reach a conclusion on the elements of the offense charged.[13] Here, the prosecution presented evidence that Harris lived with Glass up to the time Glass was murdered; that Glass was murdered sometime between 14 and 18 November 1999; that Harris was at Glass's house at least until 10:18 PM on 14 November 1999; that the murder was committed by someone familiar to Glass; that Harris issued a statement that he was "provoked;" that Harris issued a statement that his prints would be on the knife and bottle even though no one informed him that these tools were used in Glass's murder; and that Harris called Chrostowski sixteen times on 22 November 1999 indicating he wanted to leave Cleveland. Although this evidence is circumstantial, we conclude that reasonable minds could come to different conclusions as to whether Harris murdered Glass.
In order to convict Harris of grand theft under count two, the state had to prove that he, with purpose to deprive Glass of his property, knowingly obtained or exerted control over Glass's 1997 Ford Ranger pick-up truck without Glass's consent.[14] The prosecution presented evidence that Harris took Glass's truck, but did not return it, that the truck was found without the steering column intact indicating the last driver of the vehicle started the truck using the ignition keys, and that the car disappeared from Glass's home and appeared abandoned about the date Glass was murdered. We conclude that reasonable minds could come to different conclusions as to whether Harris committed theft of Glass's truck.
Because reasonable minds could reach different conclusions as to whether the prosecution proved both offenses beyond a reasonable doubt, the trial court did not err in denying Harris's Crim.R. 29(A) motion. Accordingly, Harris's second assigned error is without merit.
In his third assigned error, Harris argues his convictions are against the manifest weight of evidence presented at trial. We disagree.
When an appellant challenges a conviction on manifest weight grounds, we review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses "and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[15] The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.[16] A reviewing court will not reverse a conviction where there is substantial evidence upon which the court could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt.[17]
The record before us reveals substantial evidence upon which the jury could reasonably conclude Harris murdered Glass. Harris lived with Glass until the approximate date of Glass's death. Based upon the absence of forced entry and ransacking, and that Glass was found covered by blankets, it is likely the murder was committed by someone familiar with Glass. Chrostowski spoke with Harris at 10:18 PM on 14 November 1999 while he was at Glass's house. During this conversation, an argument occurred between Harris and Glass. Harris told Chrostowski that he would "take care of it," and then the connection terminated. Chrostowski next heard from Harris on 18 November 1999 and again on 22 November 1999. At least sixteen times during the conversations, Harris asked Chrostowski to get him and take him to Wooster.
Although no prints were found on the knife or whiskey bottle, Harris's prints were found on the door jamb in Glass's bedroom. While Harris was in the custody of the Cleveland Heights police, Harris stated that his fingerprints would be on the knife and whiskey bottle before the police informed him that these items were used in Glass's murder and ostensibly before Harris knew of Glass's death. Later, Harris issued the statement, "I was provoked."
The record also reveals substantial evidence upon which the jury could reasonably conclude Harris committed the theft of Glass's truck. Glass's truck was recovered without any steering column damage indicating the truck was last started and driven by someone possessing its keys. Harris had access to the keys and told Chrostowski he took the truck and did not return it.
Upon careful review of the record before us, we conclude, Harris's convictions are not contrary to the manifest weight of evidence presented at trial. In convicting Harris of murder and theft, the jury reasonably relied upon substantial evidence tending to prove each element of the charged offenses. Accordingly, Harris's third assigned error is without merit.
In his fourth assigned error, Harris argues the prosecutor committed prejudicial misconduct by introducing improper evidence. We disagree.
Because Harris did not object at trial to any instances of alleged prosecutorial misconduct, our standard of review is plain error.[18] In determining plain error, we examine all properly admitted evidence and determine whether the jury would have convicted Harris even if the alleged error had not occurred.[19] "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."[20]
The first incident of alleged misconduct occurred during the direct examination of Mr. Cecil Drake who testified that he met Harris eight years ago in an alcohol and drug recovery program. First, we note that Harris does not present us with a reason that introduction of this testimony is improper or amounts to misconduct. We assume he objects on the theory that introduction of such evidence violates Evid.R. 404(A), which bars introduction of character evidence to show conformity therewith. Perhaps he objects because testimony indicating Harris was a drug addict carries an inherently negative stigma.
The second incident of alleged misconduct occurred during the redirect examination of Drake who testified that Harris violated his parole for failing to report his residence. Again, Harris fails to present a legal theory as to why this incident amounts to misconduct. We assume he objects because Harris's parole violation may indicate to the jury he acted in a criminal manner in the case before us.
Assuming arguendo, that either incident amounts to error, the tainted evidence would be inconsequential in its effect. Therefore, we cannot say that but for introduction of this evidence the jury would have reached a different result.
The final incident of alleged misconduct occurred during the direct examination of Detective Gurich who testified that Glass's body being completely covered, including the head, may indicate that the victim and the perpetrator were acquaintances. Harris argues that this is improper evidence because the prosecution failed to lay a foundation. It appears to us that, in this instance, Detective Gurich offered expert testimony.[21] Consequently, his testimony is not properly admitted unless the prosecution established Detective Gurich as an expert.[22] Regardless of whether the prosecution offered improperly based expert testimony, we cannot say the jury would have reached a different result but for this evidence. Even in the absence of Detective Gurich's testimony, the record clearly establishes that the perpetrator of these crimes was an acquaintance of Glass's.
Because sufficient evidence exists to sustain Harris's conviction even absent each incident of alleged prosecutorial misconduct, we conclude that the jury would not have reached a different result were it not for these incidences. Accordingly, Harris's fourth assigned error is without merit.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, P.J., and KENNETH A. ROCCO, J., CONCUR.
[1] Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602.
[2] State v. Robinson (1994), 98 Ohio App.3d 560, 649 N.E.2d 18, citingState v. Brown (1993), 91 Ohio App.3d 427, 429, 632 N.E.2d 970, 972;State v. Rossiter (1993), 88 Ohio App.3d at 166, 623 N.E.2d at 648.
[3] Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602.
[4] Id.
[5] Id.
[6] Id. at 444.
[7] (1992), 65 Ohio St.3d 494, 605 N.E.2d 54.
[8] Id, paragraph one of the syllabus, citing State v. Williams
(1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323, paragraph four of the syllabus, followed.
[9] Id, paragraph two of the syllabus, citing Rhode Island v. Innis
(1980), 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297.
[10] See Knuckles, supra.
[11] State v. Nelson, 1999 Ohio App. LEXIS 600 (Feb. 25, 1999), Cuyahoga App. No. 73289, unreported citing State v. Beaver (1997),119 Ohio App.3d 385, 390, 695 N.E.2d 332, appeal dismissed (1997),79 Ohio St.3d 1504, 684 N.E.2d 88.
[12] R.C. 2903.02.
[13] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph 1 of the syllabus.
[14] R.C. 2913.02(A).
[15] State v. Martin (1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717,720, citing Tibbs v. Florida (1982), 457 U.S. 31, 38, 42. See, also, State v.Thomkins (1997), 78 Ohio St.3d 380, 678 N.E.2d 541.
[16] State v. Martin (1983), 20 Ohio App.3d 172,175,485 N.E.2d 717,720-721, citing Tibbs v. Florida (1982), 457 U.S. 31, 38,42. See, also, State v. Thomkins (1997), 78 Ohio St.3d 380,678 N.E.2d 541.
[17] State v. Eskridge (1988), 38 Ohio St.3d 56, paragraph two of the syllabus; State v. Eley (1978), 56 Ohio St.2d 169, syllabus.
[18] See, State v. Green (2000), 90 Ohio St.3d 352, 373, 738 N.E.2d 1208,1231, citing State v. Wade, 53 Ohio St.2d 182, 373 N.E.2d 1244, paragraph one of the syllabus; Crim.R. 52(B).
[19] See, State v. Slagle (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916,925.
[20] State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.
[21] See, generally Evid. R. 702.
[22] See Evid.R. 104(A) and 702, see, also Scott v. Yates (1994),71 Ohio St.3d 219, 221, 643 N.E.2d 105.