OPINION
{¶ 1} Appellant, Gregory D, Hawkins, appeals the judgment entry of the Portage County Court of Common Pleas, finding him guilty of complicity to aggravated burglary.
 {¶ 2} Appellant was indicted on November 2, 2000, and charged with: complicity to aggravated robbery with a firearm specification, in violation of R.C. 2923.03(A)(1), (2), and (3) and R.C. 2911.11(A)(2), a felony of the first degree; two counts of complicity to kidnapping with firearm specifications, in violation of R.C. 2923.03(A)(1), (2), and (3) and R.C. 2905.01(A)(2), felonies of the first degree; and obstruction of justice, in violation of R.C. 2921.32, a felony of the second degree. At his arraignment on November 6, 2000, he entered a plea of not guilty to the charges.
 {¶ 3} On January 5, 2001, appellant filed a motion to suppress the evidence. A suppression hearing took place on January 18, 2001, and in an entry dated January 22, 2001, the trial court overruled appellant's motion.
 {¶ 4} Thereafter, on January 29, 2001, appellant filed a motion to dismiss the indictments based on a speedy trial violation. A hearing on that motion occurred on February 5, 2001. The trial court overruled the motion to dismiss on February 6, 2001. A jury trial took place on February 6, 2001, through February 13, 2001.
 {¶ 5} At the trial, the state of Ohio presented twenty-two witnesses, and appellant presented no witnesses. The evidence at trial revealed that in the early morning hours of October 30, 2000, David Clark ("David") and Robin Stewart ("Robin") entered the Kent, Ohio residence of Ronald Henderson ("Ronald") and Latasha Franklin ("Latasha").[1] The evidence at trial suggested that the purpose of the entry was to accomplish an armed theft of money.
 {¶ 6} Latasha testified that she kept a lot of money in her house and that her babysitter, Jellaketa Jackson ("Keta") had seen her get money before. Latasha had known Keta for about a year. She recalled that appellant, Keta's boyfriend, had been to her house with Keta. Latasha stated that appellant "might have" seen money lying around her house. Latasha explained that in the summer of 2000, her sister, Danielle Franklin ("Danielle") lived with her. Danielle worked from 11:00 p.m. to 7:00 a.m. Latasha indicated that Keta knew Danielle's work schedule.
 {¶ 7} The testimony of Latasha and Ronald revealed that on the evening of October 29, 2000, they had gone to bed around 10:30 or 11:00 p.m. Their two young children were also present in the house that night as well as Latasha's nephew.[2] Latasha recalled that around 6:15 a.m., on October 30, 2000, she woke up and went to her car in the garage to retrieve her cellular phone charger to leave for Ronald. When she returned to her door, she saw a man and a woman, whom she did not recognize, standing on the sidewalk. The man and woman were later identified as David and Robin. David asked her if Ronald was there, and she told David that he was asleep. David proceeded to pull and hold a "gun out on the side of [her] and said to be quiet and open the door." When they entered the house, the alarm chime rang.[3] Since David thought the alarm was armed, Latasha told him that her sister was the only one who knew the code to deactivate it, but her sister was upstairs. Yet, David knew that her sister was not at home.
 {¶ 8} Ronald related that he was in bed when he heard the alarm chime. He also heard Latasha's voice along with other unfamiliar voices, so he retrieved his gun from the nightstand and hid it under the covers. David entered the bedroom with a gun pointed to Latasha's head. Robin entered the room and was also carrying a gun. Ronald did not recognize David or Robin and recalled that David asked where all the money was. Latasha told him that they did not have any money. However, according to Ronald and Latasha, David stated that he knew they had money because "[t]hey already told [him] you all have money." Ronald then told Latasha to show David where the money was.
 {¶ 9} Both Ronald and Latasha testified that David instructed Robin to tie them up using duct tape. While David and Robin were in the bedroom, David "went to cock the gun to put a bullet in to the chamber and it jammed up and him and [Robin] switched guns." Ronald recognized the gun that jammed as a Lorcin, which he had seen with appellant and Keta. Ronald was familiar with that gun because of the jamming problem, and he had described it to Keta as a "piece of junk gun ***."
 {¶ 10} After Latasha and Ronald were bound, Ronald stated that David made the comment that he knew "there [was] more because they told him you all got it. So where is it at?" David then took Ronald downstairs to deactivate the alarm while Robin remained upstairs with Latasha and her daughter. When David returned upstairs, he left Ronald with Robin and took Latasha downstairs. David went through the kitchen, the entertainment system in the living room, and the garage. While David and Latasha were in the garage they heard a gunshot. Upon reentering the house, they "heard somebody tumbling down the steps." Robin indicated that she had been shot. David let Latasha go, and he and Robin escaped.
 {¶ 11} Ronald related that while he and Robin were upstairs, Robin began taking jewelry from the dresser along with a couple of purses. After she was done, Ronald asked her if she could check on his son and nephew, who were in another bedroom. When Robin returned from checking on the children, Ronald "fired the pistol." Ronald believed that he discharged the gun six times. The gun shots caused Robin to fall down the stairs.
 {¶ 12} After David and Robin fled the house, Ronald ran out of his sons' bedroom window onto the roof, and he saw David and Robin run "up the street into a blue van parked about five or six houses up and [appellant] was waiting outside the van." Ronald recognized the van to be Keta's. By the time Ronald went downstairs, the police had arrived. Latasha and Ronald testified that David and Robin took between $2,500 to $3,000, along with her purses, jewelry, and cellular phone.
 {¶ 13} Upon cross-examining Latasha and Ronald, appellant's attorney pointed out inconsistencies between their testimony at the trial and the statements they made on the date of the incident. However, both Latasha and Ronald stated that their state of mind right after the incident was frantic.
 {¶ 14} Several neighbors testified at the trial. One stated that while he was out with his dogs on the morning in question, he saw three people wearing dark clothing, one female and two males, walking up and down the sidewalk pointing in different directions. A different neighbor related that while she was on the sidewalk with her dogs, she saw three people. Two people were on the sidewalk next to her house, and one on the opposite side of the street. Another neighbor, Randy Ruchotzke ("Randy"), indicated that he heard glass breaking as he left his residence. He noticed a man and a woman walking past his house, and the woman had a limp. David Barnwell ("Barnwell"), a neighbor, said that on the morning of the incident, he witnessed Ronald break "out the top bedroom window of the second floor of his house *** and he was yelling." He pointed outside and asked Barnwell to call the police. Barnwell looked where Ronald was pointing and "saw two people running from [Ronald's] house."
 {¶ 15} After receiving a disturbance call, Patrolman James Ennemoser ("Ennemoser") and Officer Martin Gilliland ("Gilliland") of the Kent Police Department went to the scene. Upon arriving at Keta's apartment, they "asked what was going on." Ennemoser stated that Keta wanted to know why the officers were at her apartment. He advised Keta that he "had been told that there had been a subject who had been shot *** and was supposedly inside the apartment." Keta told Ennemoser that there was no one in the apartment and that he could look inside. Meanwhile, Gilliland was outside with appellant, who was in the driver's side of a blue mini van. Gilliland told appellant that he needed to stop as they were investigating a possible shooting incident. Appellant stated that he was on his way to work, but Gilliland told him that he needed "to step out of the van and he complied." Gilliland and appellant then went to the apartment.
 {¶ 16} Ennemoser and Gilliland asked if they could enter, and appellant and Keta invited them into the apartment. Upon entering the apartment, Ennemoser and Gilliland did not locate anyone. However, as they were searching the apartment, Ennemoser heard Keta's cellular phone ringing. She "kept hanging it up and setting it down. Finally, after it rang several times, [appellant] swatted at the phone, she hung it up, they both looked at [Ennemoser] and looked away quickly and they mumbled something to each other."
 {¶ 17} Ennemoser and Gilliland directed their attention toward the van. They inquired as to who owned it and were advised that Keta did. They asked if they could search it, and at that point, appellant's and Keta's whole demeanor changed. According to Ennemoser, appellant and Keta "turned very uncooperative and wanted to have nothing to do with the van or let [the officers] anywhere near the van."
 {¶ 18} Appellant and Keta told Ennemoser and Gilliland that nobody was in the van. During his conversation with Ennemoser and Gilliland, appellant offered three different explanations for being in the van: (1) he needed to take his kids to school, (2) he had to go to work, and (3) he was going to buy a pack of cigarettes.
 {¶ 19} Ennemoser and Gilliland noticed that the van was sitting low and that the windows were fogged up from the inside. Based on those observations, they determined that someone was inside of the van. At that point, Sergeant Ronald Piatt ("Piatt") arrived at the scene and also agreed that someone was in the van. The three officers then decided that they were going to enter the van. They wanted to make sure the suspects and/or the injured person were not in the van. Piatt instructed Gilliland to get the keys from Keta, and if she did not relinquish them, they would force their way into the van. Keta's daughter handed Gilliland the keys. During his testimony, Piatt explained that he was going to use force because the victims told him that they believed the suspects were going to Keta's apartment.
 {¶ 20} Upon entering the van, Piatt and Gilliland located David and Robin. David was transported to the police station, and Robin was taken by ambulance to the hospital. Appellant and Keta were also taken into custody.
 {¶ 21} At the hospital, Lieutenant James R. Stein ("Stein") testified that he contacted hospital security to obtain permission from the attending physician to interview Robin. After receiving authorization, he and Detective Samuel Todd ("Todd") interviewed her. Stein described Robin as "awake" and "alert." After Stein read Robin her Miranda rights, he tape-recorded her statement. In that statement, Robin confessed that she and David entered Ronald and Latasha's home after being driven there by appellant. The tape was played for the jury. The state rested and appellant called no witnesses.
 {¶ 22} At the close of the trial, the jury returned a verdict of guilty to the charge of complicity to aggravated burglary with a firearm specification.[4] A sentencing hearing was held on April 16, 2001. In an entry dated April 18, 2001, appellant was sentenced to serve a term of imprisonment of eight years for complicity to aggravated burglary in addition to three years for the firearm specification. The terms were to run consecutively. Appellant filed the instant appeal and now assigns the following as error:
 {¶ 23} "[1.] The trial court committed prejudicial and reversible error by allowing inadmissible hearsay evidence to be used at trial in violation of [appellant's] right to confront witnesses against him as guaranteed by the Sixth Amendment to the Constitution of the United States and by Article I, Section 10 of the Constitution of the State of Ohio.
 {¶ 24} "[2.] The trial court committed prejudicial and reversible error by restricting cross-examination of two material state's witnesses in violation of [appellant's] right to effective assistance of counsel and due process of law as guaranteed by the Sixth andFourteenth Amendments to the Constitution of the United States and by Article I, Section 10 of the Constitution of the State of Ohio.
 {¶ 25} "[3.] The trial court committed prejudicial and reversible error by overruling [appellant's] motion to dismiss the indictments against him in the captioned case based upon the denial of his right to a speedy trial as guaranteed by the Constitution of the United States, the Constitution of the State of Ohio and by Section 2945.71(D) of the Ohio Revised Code.
 {¶ 26} "[4.] The verdict of the jury in the case sub judice is against the manifest weight of the evidence and is contrary to law."
 {¶ 27} In his first assignment of error, appellant asserts that the trial court erred by allowing inadmissible hearsay to be used at the trial in violation of his right to confront witnesses against him.
 {¶ 28} A trial court has broad discretion to admit evidence, and an appellate court will not disturb the trial court's decision unless it has abused its discretion and the defendant has been materially prejudiced. State v. Long (1978), 53 Ohio St.2d 91, 98. An abuse of discretion is more than an error of judgment; instead, it demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619,621. When applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court. Id.
 {¶ 29} Generally, out-of-court statements offered to prove the truth of the matter asserted are inadmissible hearsay. Evid.R. 801(C) and Evid.R. 802. However, numerous exceptions to the hearsay rule exist. Here, we note that Robin's taped statement to Stein and Todd fall within the hearsay exception of a statement against interest.
 {¶ 30} To fall within the hearsay exception as a statement against interest under Evid.R. 804(B)(3), three conditions must be met. State v.Gilliam (1994), 70 Ohio St.3d 17, 20. First, the declarant must be deemed unavailable. Id. The declarant invoking his Fifth Amendment right against self-incrimination has been held to render the declarant "unavailable."Id.; State v. Landrum (1990), 53 Ohio St.3d 107, 113. In this case, Robin told the court that she did not want to testify, and the trial court granted her that right pursuant to the Fifth Amendment. Accordingly, she was "unavailable" for trial.
 {¶ 31} Second, it must be shown that the statement tended to subject the declarant to criminal liability and a reasonable person, in the declarant's position, would not have made the statement unless it was true. Gilliam, 70 Ohio St.3d at 20; Landrum, 53 Ohio St.3d at 113. Robin's statement tended to subject her to criminal liability and is therefore, a statement against interest as provided in Evid.R. 804(B)(3).
 {¶ 32} Lastly, corroborating circumstances must exist to indicate the trustworthiness of the statement. Gilliam, 70 Ohio St.3d at 20; Landrum, 53 Ohio St.3d at 113-114. A statement that is made voluntarily and corroborated by other witnesses' testimonies is more trustworthy.State v. Marshall (2000), 136 Ohio App.3d 742, 749. Additionally, the existence of some inconsistencies does not prevent the statement's admission if the circumstances establish the trustworthiness of the statement. Landrum, supra, at 114-15. The trial court maintains the discretion to determine whether sufficient corroborating circumstances exist to indicate the trustworthiness of the statement. Id. at 114.
 {¶ 33} In the present matter, there are sufficient corroborating circumstances that indicate that the statement was trustworthy. The testimony of other witnesses corroborated the content of Robin's statement, and there was evidence that supported that her statement was made voluntarily. Consequently, we conclude that the trial court did not abuse its discretion in determining that Robin's statement was trustworthy and admitting it.
 {¶ 34} Under the first assignment, appellant also alleges that the use of the hearsay evidence violated his right to confront witnesses against him. Generally, the Confrontation Clause and the hearsay rules protect the same values as a result of their commonality in origin; nonetheless, the proscriptions of the Confrontation Clause cannot be likened with the general rule prohibiting the admission of hearsay statements. White v. Illinois (1992), 502 U.S. 346, 352-353. The Confrontation Clause of the Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to *** be confronted with the witnesses against him ***" and ensures that a defendant will not be convicted based upon charges of unseen, unknown, and unchallengeable witnesses. Lee v. Illinois (1986), 476 U.S. 530,540. Hence, the Confrontation Clause prohibits the admission of some evidence that would otherwise be admissible under a hearsay exception.Idaho v. Wright (1990), 497 U.S. 805, 814.
 {¶ 35} In Ohio v. Roberts (1980), 448 U.S. 56, 65-66, the United States Supreme Court established a two-prong test to determine when a hearsay statement would be admissible and not infringe upon the Confrontation Clause: (1) the prosecutor must show that the declarant is unavailable to testify, and (2) the statement must bear adequate "indicia of reliability." The indicia of reliability prong can be satisfied with a showing that the evidence falls within a "firmly rooted" hearsay exception or the evidence has particularized guarantees of trustworthiness. Id. However, it must be noted that a statement against interest has been found not to fall within a "firmly rooted" hearsay exception. See State v. Madrigal (2000), 87 Ohio St.3d 378, 385, citingLilly v. Virginia (1999), 527 U.S. 116.
 {¶ 36} "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." Wright, 497 U.S. at 822. The guarantees of trustworthiness must be shown from the totality of the circumstances.Id. at 819. In the case sub judice, we have already determined that Robin was "unavailable" to testify; thus, we must determine whether her taped statement possessed the required indicia of reliability.
 {¶ 37} After reviewing the transcript from her taped statement, Robin did not attempt to completely exonerate herself and shift the blame to appellant, David, and Keta. In fact, she admitted that she was involved in the incident that took place at the residence of Ronald and Latasha on October 30, 2000. Furthermore, Robin was not given a promise or any consideration in exchange for her statement. Finally, Robin gave her statement to Stein and Todd after she was fully advised of her rights. Therefore, it is our view that Robin's statement satisfied the indicia of reliability prong and did not violate the Confrontation Clause of the Sixth Amendment to the United States Constitution. Accordingly, appellant's first assignment of error is overruled.
 {¶ 38} For the second assignment of error, appellant contends that the trial court erred by limiting his cross-examination of two of the state's witnesses and violating his right to effective assistance of counsel. Specifically, appellant claims that the trial court limited his ability to cross-examine Stein about the statement he took from Robin. Appellant also maintains that he was not allowed to fully cross-examine Jeffrey Lynn ("Lynn") from the Bureau of Criminal Investigation regarding his tear-line analysis of the duct tape.
 {¶ 39} A criminal defendant's right to confront and cross-examine a witness is not unlimited. Delaware v. Van Arsdall (1986), 475 U.S. 673,679. A trial court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. Thus, "`the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Id., quoting Delaware v. Fensterer
(1985), 474 U.S. 15, 20. Furthermore, the "constitutional right to cross-examine adverse witnesses does not authorize defense counsel to disregard sound evidentiary rules." State v. Amburgey (1987),33 Ohio St.3d 115, 117.
 {¶ 40} Here, in reviewing the trial transcript, the jury had before it the testimony of several police officers as well as the taped statement of Robin. It is our view the trial court did not err in sustaining some of the objections raised by the prosecution since the trial court did not repeatedly enforce its ruling because defense counsel extensively cross-examined Stein after the objections were sustained. The cross-examination related to Stein's acquisition of Robin's statement and defense counsel was able to argue that Robin's statement was unreliable. Further, the jurors were able to hear the questions and answers as the taped statement was played for them in court. Thus, any error that occurred was harmless at best as appellant was not prejudiced in any way.
 {¶ 41} Moving onto appellant's contention that his cross-examination of Lynn was limited. Lynn's testimony dealt with the duct tape that was used to restrict Ronald and Latasha. He testified that he would be unable to duplicate the results on the stand that he accomplished in his lab. Yet, even if there was error, this court fails to see how the issue of the duct tape relates to appellant's conviction for complicity to aggravated burglary. It would appear that any testimony on the duct tape issue would be more appropriate if appellant had been convicted of kidnapping. However, the kidnapping charges resulted in a hung jury. Therefore, any error would have been harmless as there was no prejudice. Appellant's second assignment of error is not well-founded.
 {¶ 42} Under his third assignment of error, appellant argues that the trial court erred by denying his motion to dismiss based on the denial of his right to a speedy trial.
 {¶ 43} The Sixth Amendment to the United States Constitution requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury[.]" Pursuant to R.C. 2945.71(C)(2), an individual against whom a felony charge is pending must be brought to trial within two hundred seventy days after his arrest. In computing this time, each day a defendant is held in jail, in lieu of bail, counts as three days. R.C. 2945.71(E).Here, we disagree with both appellant's and the state's speedy trial calculations. Appellant filed a motion to suppress on January 5, 2001, which was not ruled upon until January 22, 2001. The speedy trial time was tolled through January 22, 2001. State v. Jordan (Oct. 15, 1999), 11th Dist. No. 97-T-0088, 1999 WL 959833, at 5. Hence, when appellant filed the motion to suppress only sixty-seven days had passed. However, these particular days are subject to the triple count treatment under R.C.2945.71(E). Thus, a total of two hundred one days had lapsed, leaving sixty-nine more days.
 {¶ 44} The time began running again on January 22, 2001, until appellant filed a motion to dismiss on January 29, 2001. The motion was overruled on February 6, 2001, the day of the trial. During the period January 22 through January 29, seven days passed, or twenty-one days pursuant to R.C. 2945.71(E). As a result, when appellant was brought to trial, only two hundred twenty-two days had expired. Accordingly, it is our view that appellant was brought to trial well within the statutory speedy trial time. Appellant's third assignment of error lacks merit.
 {¶ 45} In the fourth assignment of error, appellant claims that his conviction was against the manifest weight of the evidence and contrary to law.
 {¶ 46} In deciding if a verdict is against the manifest weight of the evidence, an appellate court reviews the entire record, weighs all the evidence and reasonable inferences stemming therefrom, and considers the credibility of the witnesses. State v. Beaver (1997),119 Ohio App.3d 385, 398; State v. Thompkins (1997), 78 Ohio St.3d 380,387; State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 WL 738452, at 5. The trier of the facts has the primary responsibility for determining the "*** weight to be given the evidence and the credibility of the witnesses ***." State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. After we conduct our review of the record, if we conclude that the jury lost its way, we will reverse the conviction. Beaver at 398.
 {¶ 47} In the case at bar, there were twenty-two witnesses presented by the state. Appellant presented no witnesses in his behalf. We cannot say that the jury lost its way and created such a miscarriage of justice so that the conviction must be reversed. The jury found the state's witnesses to be credible. Therefore, this court will not substitute our judgment for that of the jury. We conclude that based on the witnesses presented by the prosecution, the state proved beyond a reasonable doubt the necessary elements of complicity to commit aggravated burglary. Further, there was adequate evidence that the jury could find credible upon which to base the conviction. Appellant's fourth assignment of error is without merit.
 {¶ 48} For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Portage County Court of Common Pleas is affirmed.
ROBERT A. NADER, J. concurs.
WILLIAM M. O'NEILL, P.J., dissents with dissenting opinion.
[1] At the trial, Robin refused to testify and invoked herFifth Amendment rights. However, a taped statement that she made while in the hospital was admitted into evidence.
[2] At that time, Latasha's and Ronald's son was two years old, their daughter was six months old, and Latasha's nephew was seven years of age.
[3] Latasha and Ronald had an alarm system in their home that beeped when the door opened.
[4] The jury deadlocked on the two counts of complicity to kidnapping. The trial court declared a mistrial as to those counts. The state moved to dismiss the obstruction of justice charge, which was granted.